**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

JANE CRUDUP,                )             **CASE NO. 8:21CV0045**
                                 )
            Plaintiff,     )
                                 )
     vs.                    )
                                 )
CITY OF OMAHA,          )
                                 )
            Defendant.   )

**BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Prepared and submitted by:
MICHELLE PETERS, No. 20021
Deputy City Attorney
Attorney for Defendants
804 Omaha/Douglas Civic Center
1819 Farnam Street
Omaha, NE 68183
(402) 444-5115
michelle.Peters@cityofomaha.org

# INTRODUCTION

Defendant City of Omaha, pursuant to Fed.R.Civ.P. 56, respectfully moves this Court to dismiss the Plaintiff's First Amended Complaint based on Summary Judgment because there are no material facts in dispute and Defendant is entitled to judgment as a matter of law.

Plaintiff's First Amended Complaint generally alleges a series of discriminatory and/or retaliatory events that occurred during her brief employment as a firefighter with the City of Omaha Fire Department. Plaintiff alleges violations of the Nebraska Fair Employment Practices Act, Title VII of the Civil Rights Act, 42 U.S.C. § 1981, and Equal Protection under the U.S. Constitution. For the reasons set forth herein, Defendant is entitled to judgment as a matter of law; and Plaintiff's First Amended Complaint must be dismissed.


# UNDISPUTED FACTS

1.   Plaintiff is an African American female (First Amended Complaint, Doc. #56, ¶ 13).

2.   Plaintiff was hired as a probationary firefighter with the City of Omaha Fire Department on January 14, 2019 (First Amended Complaint, Doc. #56, ¶ 14).

3.   Plaintiff successfully completed her training at the Omaha Fire Academy on April 2019 and was assigned to Fire Station 42. (First Amended Complaint, Doc. #56, ¶ 16; Crudup Deposition, Vol. I, 23:25 - 24:7).

4.   Captain John Shoemaker was Plaintiff's supervisor at Station 42 (First Amended Complaint, Doc. #56, ¶ 17).

5.   Plaintiff was only assigned to Station 42 for approximately one month and was reassigned to Station 41 on or about May 4, 2019 (First Amended Complaint, Doc. #56, ¶ 21).

6.   Captains Scott Schendt and Todd Dipple were Plaintiff's supervisors at Station 41 (First

Amended Complaint, Doc. #56, ¶ 22).

7.    Firefighter Mark Lukowski (white male) was assigned as a probationary Firefighter candidate to Station 41 from approximately April 2019 to February 2020 and worked with Plaintiff at that Station from May 2019 to February 2020. (Lukowski affidavit ¶ 3; Crudup Deposition Vol. I, 29:11 - 30:13).

8.    Captain Schendt and Captain Dipple sat down informally with all candidates, including Plaintiff and candidate Lukowski shortly after they were assigned to the station and told them there will be joking and teasing during their time as a firefighter candidate, but if the candidate had any problems with it, to let the Captains know and they would put a stop to it. (Dipple Deposition, 42:14-43:23, 44:10-20; Schendt Deposition 25:5-26:17; Lukowski affidavit ¶ 5)

9.    Plaintiff recalls having the conversation with Schendt and Dipple about expectations and joking at the fire station, but she claims she doesn't remember them saying if the joking started to bother her, she should come to one of them and they would put an end to it. (Crudup Deposition Vol. I, 30:18 - 32:3).

10.    While at Station 41, firefighters joked and teased fire candidate Mark Lukowski. (Lukowski affidavit, § 8; Crudup Deposition, Vol. I, 89:16-19).

11.    At one point during their candidacy, Plaintiff and Candidate Lukowski were working on breaking a hose apart after assisting the Public Works Department clean out a sewer blockage. The candidates were using a hydrant wrench and were having a difficult time uncoupling the hose. FF Heath Reyzlik approached them and advised that there was a better way to accomplish the task, advising them they needed to use the correct tool (a spanner

wrench). (Lukowski affidavit ¶ 6, Crudup Deposition, Vol. I, 42:6 – 43:4; Schendt Deposition, 37:20 - 38:25).

12. Plaintiff started disagreeing with FF Reyzlik whether the tool they were using was a spanner wrench and Reyzlik kept telling her that it wasn't a spanner wrench. Reyzlik finally threw up his hands and walked off. (Crudup Deposition, Vol. I, 42:6 – 43:4; Schendt Deposition, 37:20 – 39:12).

13. Captain Schendt, who was in the vicinity and saw the interaction, but didn't hear the conversation, came over to Plaintiff and Lukowski and advised them when another firefighter is trying to help you, you need to shut up and listen. (Crudup Deposition Vol. I, 43:5-8; Lukowski Affidavit ¶ 7; Schendt Deposition 39:23 – 41:12).

14. This directive was given to both Plaintiff and fire candidate Lukowski. (Lukowski affidavit ¶ 7; Crudup Deposition, Vol. I, 45:14-16).

15. Plaintiff never complained to Captains Dipple or Schendt about teasing/joking at Station 41. (Dipple Deposition 102:21 - 103:9; Schendt Deposition 96:4-16).

16. The firefighters at Station 41 also joked with Mark Lukowski. (Crudup Deposition Vol. I 89:16-19).

17. It was common practice at Fire Station 41 that if you forgot your gear, it would go up the flagpole. (Schendt Deposition 36:1-5).

18. Firefighter Eric Schack, who is a white male, had his fire shirts run up the flagpole at Station 41 in April 2018 when he was a candidate at that station. (Schack affidavit ¶¶ 3-4).

19. Firefighter Joseph Tisthammer, who is a white male, had his fire gear run up the flagpole at Station 41 in 2017 when he was a candidate at that fire station because he didn't take his fire gear with him when he left the station. (Tisthammer affidavit ¶¶ 3-5).

20. Firefighter Matthew Salmon, who is a white male, had his fire gear run up the flagpole at Station 41 in 1998 or 1999 when he was a candidate at that fire station because he didn't take his fire gear with him when he left the station. (Salmon affidavit ¶¶ 3-5).

21. Plaintiff never heard anyone at the Fire Station ever call her a derogatory name. (Crudup Deposition, Vol. I, 46:2-4)

22 No one at the Fire Station ever showed Plaintiff any derogatory photos or videos. (Crudup Deposition, Vol. I, 46:5-7)

23. Plaintiff was never touched inappropriately by anyone at the Fire Station. (Crudup Deposition, Vol. I, 46:23:25)

24. Plaintiff never heard the "N' word used at Station 41. (Crudup Deposition, Vol. I, 48:3-5)

25. Plaintiff alleges that on five instances inappropriate comments were made or actions taken at Station 41 from May 2019 to April 2020:

(a)     At the scene of an infant death, Firefighter Vacek comment about the baby, who was African American, "it's sad to say, but that's the best thing that could have happened to that baby." (Crudup Deposition, Vol. I, 32:25 - 33:18) When questioned by Plaintiff why he would say such a thing, he commented on the poor living conditions. (Crudup Deposition Vol. I, 32: 5-18)

(b)     If political issues were being televised, Captain Schendt would sometimes make a comment "all Democrats could just kill themselves." (Crudup Deposition, Vol. I, 33: 21 - 34:10) Plaintiff did not believe such comments were directed at her, but felt they were "inappropriate." (Crudup Deposition, Vol. I, 32: 25 - 34:2)

(c)     Another time a television comedy program was on and there was a skit dealing with a Caucasian woman that identified as black. Captain Schendt stated something to the effect "If that came to my house, I would shoot it." (Crudup Deposition, Vol. I, 36:4-18)

(d).     There was an incident that is described above in Undisputed Facts paragraphs 10-13 regarding the uncoupling of the hose with fire candidate Lukowski.

(e)     There was a situation on or about March 14, 2020, while still at fire station 41, while firefighters were re-fueling a truck, that the driver attempted to leave while Plaintiff was till trying to get back on the truck. Plaintiff confronted the firefighter and he stated "I thought you were inside the truck." (First Amended Complaint, Doc. #56, ¶ 38).

26.     Plaintiff never reported any of these instances of inappropriate behavior to any supervisor (Crudup Deposition, Vol. I, 32:4-8), or to a Battalion Chief, the Fire Chief, the HR Director or the Mayor (Crudup Deposition, Vol. I, 40:19 - 41:12), even though she was aware of the Executive Order entitled "Prohibition Against Unlawful Discrimination Based Upon Race, Color, Creed, Ethnicity, Religion, Sex, Marital Status, Sexual Orientation, Gender Identity, National Origin, Age or Disability until she met with David Grauman on or after April 14, 2020. (Crudup Deposition, Vol. I, 37:18 - 39:25, Deposition Exhibit 3, pp. 2-6)

27.     On March 2, 2020, Plaintiff left her turnout gear (firefighter coat, pants, boots, and helmet) at Station 41 when she left the fire house at approximately 7:00 a.m. (First Amended Complaint, Doc. #56, ¶ 31).

28.     Plaintiff intentionally left her gear at the station even though training personnel and co-workers at the station told her she needed to bring her gear with her at all times. (Crudup Deposition, Vol. I, 61:11 - 62:16; Schendt Deposition 91:2-18).

29. Even African American female Firefighter Sheena Glover told her that she should have brought her gear with her. (Crudup Deposition, Vol. I, 68:12-19)

30. The following morning, March 3, 2020, Plaintiff had to report directly to the Training Academy to take an examination (Crudup Deposition, Vol. I, 58:15 - 59:4).

31. When Plaintiff returned to Station 41, a civilian neighbor to the fire station stated to Plaintiff "Oh, they got you," pointing to the flag pole. (Crudup Deposition, Vol. I, 59:15-24)

32. At that time, Plaintiff noticed that her helmet and her coat had been affixed to the flag pole and hanging from the flag pole. (First Amended Complaint, Doc. #56, ¶ 32)

33. Plaintiff had previously had her boots run up the flag pole when she forgot them at Station 41. (Crudup Deposition, Vol. I, 63:22 - 64:11)

34. Although Plaintiff thought running her boots up the flag pole was distasteful, but not offensive, she said, "okay, I won't forget my boots and stuff anymore." (Crudup Deposition, Vol. I, 64:12-20)

35. Plaintiff did not discuss hanging of her fire gear from the flag pole with anyone at the fire station. (Crudup Deposition, Vol. I, 69:1-5, 10-12)

36. Plaintiff did not report hanging of her fire gear from the flag pole to her direct supervisors, Todd Dipple or Scott Schendt. (Crudup Deposition, Vol. I, 69:6-9; Dipple Deposition 36:20 - 37:23; 100:23 - 101:6; Schendt Deposition 95:24 - 96:3)

37. Plaintiff did not report hanging of her fire gear from the flag pole to a battalion chief, an Assistant Chief or the Fire Chief, until April 12, 2022. (Crudup Deposition, Vol. I, 70:3-21)

38. Plaintiff did not report hanging of her fire gear from the flag pole to anyone in the City's Human Resources Department until April 12, 2022. (Crudup Deposition, Vol. I, 70:3-21)

39. Plaintiff did not report hanging of her fire gear from the flag pole to the Mayor's office until April 12, 2022. (Crudup Deposition, Vol. I, 70:3-21)

40. Plaintiff remained at Fire Station 41 until she successfully completed her probationary status on April 2, 2020 (First Amended Complaint, Doc. #56, ¶ 39).

41. On April 4, 2020, Plaintiff was transferred to Station 61 (First Amended Complaint, Doc. #56, ¶ 39).

42 On April 12, 2020 (Easter Sunday), another female firefighter, Sheena Glover, sent an email to the Fire Chief, the Mayor's Deputy Chief of Staff, the Labor Relations Director, and the Fire Union President advising them of the coat hanging incident on March 3, 2020 (First Amended Complaint, Doc. #56, ¶ 40).

43. As soon as the Labor Relations Director David Grauman received that email, he began an investigation into the March 3, 2020 incident (Grauman Deposition 30:18-24; 34:15 - 35:2)

44. When Mr. Grauman spoke to Plaintiff on or about April 14, 2022, he asked Plaintiff if she felt safe at work and, if not, did she want to move to another station and she declined. (Crudup Deposition, Vol. I, 79:24 - 80:16; Grauman Deposition 38:11-24; 218:18 - 219:24)

45. Mr. Grauman advised Plaintiff that at any time she wanted to move, to let him know and Plaintiff never took him up on the offer. (Crudup Deposition, Vol. I, 80:17-23)

46. Mr. Grauman interviewed the following people as part of his investigation Jane Crudup, Scott Schendt, Todd Dipple, Mark Lukowski, Terrance Almond, Jeremy Bryant, Heath Reyzlik, Derek McMillin, and Chris Vacek. (Grauman Deposition 39:6-10; 43:7-14; 57:21-58:6)

47.  Battalion Chief Doug Krysl Internal Affairs investigator at the Omaha Fire Department assisted Mr. Grauman with his investigation. (Grauman Deposition 50:14-51:23)

48.  On or about April 17, 2020, Plaintiff found a "used surgical mask" in her boot while working at Station 61 (First Amended Complaint, Doc. #56, ¶ 42).

49.  On or about May 4, 2020, Plaintiff's helmet straps were "tampered with" (First Amended Complaint, Doc. #56, ¶ 43).

50.  Plaintiff had been on administrative leave from the Omaha Fire Department since May 22, 2020 (First Amended Complaint, Doc. # ¶ 54).

51.  Mr. Grauman issued his investigatory findings on July 24, 2020, generally finding that there was no violation of City or Fire Department policies and procedures. (Grauman Deposition 118:2-120:1; Deposition Exhibit 9)

52.  Mr. Grauman's investigation indicated that white male firefighters had their fire gear run up flag poles at the Omaha Fire Department. (Grauman Deposition 122:20 - 123:24; Deposition Exhibit 9, pp. 1-2)

53.  Mr. Grauman's investigation also indicated that another Black male firefighter, Terrance Almond, had been at Station 41 for five years and had never felt harassed or discriminated against and did not feel Plaintiff had been either. (Grauman Deposition, 215:16 - 217:20)

54.  In May 2020, the Omaha Fire Department issued a new Standard Operating Procedure, at the direction of Fire Chief Daniel Olsen as a result of the incident on March 3, 2020 entitled "Personnel 8-0 Harassment Prevention Policy" which states in relevant part: "OFD will not tolerate the hazing of members. This includes any intentional or reckless act that endangers the mental or physical health or safety of a person as well as any activity that intimidates or threatens a person with ostracism or subjects them to mental stress, shame

or humiliation, regardless of content or context. OFD acknowledges the tradition associated with training firefighter candidates, yet when hazing interferes with a candidate's ability to effectively learn, or crosses the line to the point of becoming harassment, the behavior will not be tolerated." (Olsen Deposition, 55:17 - 58:11; Deposition Exhibit 3, pp. 21-24).

55. On May 30, 2022, Plaintiff resigned from the Omaha Fire Department. (First Amended Complaint, Doc. #56, ¶ 61, Deposition Exhibit 14)

56. Plaintiff has been employed by UPS since 2006 in a part-time capacity and remained employed there while employed by the Omaha Fire Department, and is currently employed by UPS. (Crudup Deposition, Vol. I, 9:21 – 10:17)

## STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "[S]ummary judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (internal quotation marks omitted) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc)). "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted." *Smith-Bunge v. Wis. Central, Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019) (citation omitted).

At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by " 'showing' – that is, pointing out to the district

court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c)(1).

In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). An "adverse party may not rely merely on allegations or denials, but must set out specific facts – by affidavits or other evidence – showing [a] genuine issue for trial." *Tweeton v. Frandrup*, 287 F. App'x 541, 541 (8th Cir. 2008) (citing Fed. R. Civ. P. 56(e)). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted).

## ARGUMENT

## I.

## TITLE VII, NFEPA and § 1981 CLAIMS OF RACE DISCRIMINATION
### (First, Second and Third Causes of Action)

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff can show Title VII gender discrimination

claim either by producing direct evidence of Defendant's unlawful discrimination or by producing evidence that creates an inference of unlawful discrimination under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *McGinnis v. Union Pac. R.R.,* 496 F.3d 868, 873 (8th Cir.2007). Direct evidence of unlawful discrimination constitutes "'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action." *Torgerson v. City of Rochester,* 643 F.3d 1031, 1044 (8th Cir.2011). If there is no direct evidence of discrimination, [Plaintiff] must create an inference of discrimination by proving the following elements: "[s]he (1) is within the protected class, (2) was qualified to perform her job, (3) suffered an adverse employment action, and (4) was treated differently than similarly situated employees who were not members of the protected class." *Wilkie v. Dep't of Health & Human Servs.,* 638 F.3d 944, 954–55 (8th Cir.2011). Plaintiff appears to allege direct evidence of race and/or gender discrimination in this matter. See *Beshears v. Asbill,* 930 F.2d 1348, 1354 (8th Cir. 1991) ("[D]irect evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude ... [c]omments which demonstrate a 'discriminatory animus in the decisional process' ... or those uttered by individuals closely involved in employment decisions may constitute direct evidence." (citations omitted)). "The elements of a Title VII disparate treatment claim and a § 1981 claim are identical." *Kim v. Nash Finch Co*., 123 F.3d 1046, 1056 (8th Cir. 1997); citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 2747 n. 1 (1993) (noting *McDonnell Douglas* framework also applies to claims of purposeful employment discrimination on the basis of race under 42 U.S.C. § 1983).

Title VII prohibits employers from discriminating against employees because of their race,

color, or national origin, 42 U.S.C. § 2000e-2(a)(1); and 42 U.S.C. § 1981 "prohibit[s] employers from retaliating against employees for opposing racial discrimination." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013). Claims of discrimination and retaliation brought under § 1981 are analyzed in the same manner as discrimination and retaliation claims brought under Title VII, *id.*; and the Nebraska Supreme Court and the Eighth Circuit "have stated the NFEPA 'is patterned after Title VII,' and, therefore, 'it is appropriate to consider federal court decisions construing the federal legislation' when considering questions under the NFEPA." *Al-Zubaidy v. TEK Industries, Inc.*, 406 F.3d 1039 (quoting *City of Fort Calhoun v. Collins*, 500 N.W. 2d 822, 825 (Neb. 1993)).

Although not entirely clear from the First Amended Complaint, Defendant believes that Plaintiff will rely on the incident on March 3, 2020 wherein her fire gear was strung up a flag pole at Station 42 as direct evidence of discrimination. In this case, the Defendant agrees that Plaintiff is a black female and therefore is a member of a protected class. Also, Defendant concedes that Plaintiff was qualified for the position of Firefighter. However, Defendant challenges the third and fourth prongs of the traditional prima facie analysis; that is, that Plaintiff cannot show either an adverse employment action or that similarly situated white firefighters were treated more favorably than the Plaintiff.

With regard to adverse employment actions, the Eighth Circuit Court of Appeals has stated that "[n]ot everything that makes an employee unhappy is an actionable adverse employment action ... Rather, an adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits or responsibilities." *LaCroix v. Sears, Roebuck, and Co.,* 240 F.3d 688, 691 (8th Cir. 2001). "Mere inconvenience without any decrease in title, salary, or benefits is insufficient to show an adverse employment action." *Sallis v. Univ. of Minn.,*

408 F.3d 470, 476 (8th Cir. 2005) (quoting *Cruzan v. Special Sch. Dist. No. 1,* 294 F.3d 981, 984 (8th Cir. 2002)). Minor changes in working conditions that inconvenience an employee or alter the employee's work responsibilities do not rise to the level of an adverse employment action. *Sallis,* 408 F.3d at 476. Applying this high standard, the Eighth Circuit has concluded that "[c]onduct that is merely rude, abrasive, unkind, or insensitive does not come within the scope of the law." *Shaver v. Indep. Stave Co.,* 350 F.3d 716, 721 (8th Cir. 2003) (construing the Americans with Disabilities Act and observing that "anti-discrimination laws do not create a general civility code"). Moreover, the Eighth Circuit has stated that decision to place an employee on paid administrative leave and its offer to transfer her to a different location were not adverse employment actions. *See Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 891–92 (8th Cir. 2005); *Spears v. Mo. Dep't of Corr.*, 210 F.3d 850, 853–54 (8th Cir. 2000).

First, Plaintiff did not suffer any adverse employment action. Plaintiff was employed by the City of Omaha up until May 30, 2022. At the recommendation of her doctor, and a follow-up independent medical exam by a doctor retained by the Defendant, Plaintiff was on unpaid administrative leave commencing in May of 2020. The City of Omaha accommodated her doctor's recommendations. She was not terminated and she has not been demoted. The City of Omaha was willing to re-instate Plaintiff whenever she chose to return to work or was released by her doctor to do so. Plaintiff claims that she was not able to come back to work and finally resigned her employment on May 30, 2022. Plaintiff's claim of hostile work environment and constructive discharge will be discussed *infra.*

Prior to Plaintiff voluntarily going on administrative leave, she had suffered no adverse actions at work. She did not lose hours, wages or benefits. She was not demoted or fired. She chose

to go on administrative leave from the Omaha Fire Department and continued to work at her previous job – United Parcel Services, where she remains employed to this day.

Although Plaintiff was not being paid, she did not report to work in more than two years but was still listed as an employee. The City held her position for her when she is ready to return to work. Although Plaintiff returned to work in a part-time capacity for another organization immediately after she left the City's employment, she has been unable, or unwilling to return to work at the Omaha Fire Department. Plaintiff's decision to not return to work cannot be imputed as an adverse action taken by the City. *See Jackman v. Fifth Judicial Dist. Dept. of Correctional Serv.,* 728 F.3d 800, 804 (8th Cir. 2013) (employee's decision to take sick leave due to work-related stress from discrimination and harassment was not adverse employment action).

Second, Plaintiff cannot show she was treated any differently than similarly situated white employees. The undisputed evidence shows that joking and kidding around happens at work at the fire station. Plaintiff admits that her co-worker, Mark Lukowski, who is a white male probationary firefighter that was assigned to Station 41 at the same time as Plaintiff, also had jokes played on him (Undisputed Fact # 10) When Captain Schendt said "shut up and listen," candidate Lukowski was also present. (Undisputed Fact #14). Other white firefighters, including Joey Tisthammer, Erick Schack and Matt Salmon had their equipment ("PPE") put up the flag pole at Station 41. (Undisputed Facts 18-20). It was common practice at Fire Station 41 that if you forgot your gear, it would go up the flagpole. (Undisputed Fact 17) In fact, Plaintiff had previously had her boots run up the flag pole when she forgot them at Station 41. (Undisputed Fact 33). Notwithstanding these facts, Captains at the fire house had sat down informally with Plaintiff shortly after she was assigned to the station and told her there will be joking and teasing during their time as a firefighter candidate, but if the candidate has any problems with it, to let the Captains know and they will put

a stop to it. (Undisputed Fact 8). Although Plaintiff will deny this fact because she conveniently does not recall the Captains telling her to come to them. But denying that fact does not preclude Summary Judgment. Whether or not her supervisors told her to come to them with problems, under the law, she has a duty to put the City on notice that alleged discrimination is occurring. Again this will be discussed in more detail in the constructive discharge section, *infra*. The fact remain that Plaintiff never complained to Captains Dipple or Schendt about teasing/joking while she was stationed at Station 41. (Undisputed Fact 15)

While placing fire gear up a flag pole may at first blush appear to be discriminatory in nature, upon a review of all the facts of the parties involved, it was ultimately determined that this was something done frequently at the fire stations to reiterate the importance of firefighters bringing their fire gear with them so that they are prepared in case of emergency. This one incident does not show Plaintiff was discriminated against based on race as the undisputed facts show that white males also had their fire gear strung up the flag pole.

Because Plaintiff cannot show a prima facie case of race discrimination, these claims must be dismissed as a matter of law.

## II.
## HOSTILE WORK ENVIRONMENT and
## CONSTRUCTIVE DISCHARGE
### (Fourth, Fifth, Sixth, Eleventh, Twelfth, and Thirteenth Causes of Action)

Plaintiff alleges she was subject to a hostile work environment while working for the Omaha Fire Department which resulted in her constructive discharge. For Plaintiff to succeed on a hostile work environment claim, she must prove: (1) plaintiff is a member of a protected class; (2) plaintiff was exposed to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment affected a term, condition, or privilege of

employment; and (5) the employer knew or should have known about the harassing behavior, but failed to take proper action to alleviate it." *Arraleh v. County of Ramsey,* 461 F.3d 967, 978 (8th Cir. 2006). A plaintiff establishes a hostile work environment claim by proving that the alleged conduct was extreme enough that it amounted to a change in the terms and conditions of employment. *Burkett v. Glickman,* 327 F.3d 658, 662 (8th Cir. 2003). Unless the conduct is extremely serious, isolated incidents of offensive conduct and offhand comments do not constitute a hostile work environment. *Id.*

The Eighth Circuit Court of Appeals has described the harassment standards as "demanding." *Arraleh,* 461 F.3d at 979. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Id.* (quoting *Al-Zubaidy v. TEK Indus., Inc.,* 406 F.3d 1030, 1038 (8th Cir. 2005)). Relevant factors for determining whether conduct rises to the level of harassment include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. *Pye v. Nu Aire, Inc.,* 641 F.3d 1011, 1018 (8th Cir. 2011).

As Judge Kopf has opined:

> The United States Supreme Court has never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations. The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (internal quotation and citation omitted). In other words, Plaintiff will need to "prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.' *Id.* (quoting 42 U.S.C. § 2000e-2(a)(1)).

*Robinson v. Bridgeport Pub. Sch.,* No. 8:16CV177, 2016 WL 3920167, at *4 (D. Neb. July 15, 2016).

"To survive summary judgment, a plaintiff must present evidence from which a reasonable jury could conclude that the harassment was sufficiently 'severe or pervasive' to affect a term, condition, or privilege of the plaintiff's employment." *Powell v. Yellow Book USA, Inc.,* 445 F.3d 1074, 1077 (8th Cir. 2006) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). A cognizable hostile work environment claim requires the harassment be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Helton v. Southland Racing Corp.,* 600 F.3d 954, 958 (8th Cir.2010). Furthermore, the work environment must be both objectively and subjectively offensive, meaning a reasonable person would find the work environment hostile or abusive, and, further, that Plaintiff actually perceived the environment as such. *Id.* at 958–59. It is not the purpose of the harassment statutes "to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight." *Powell,* 445 F.3d at 1077. The court has "repeatedly emphasized that anti-discrimination laws do not create a general civility code." *Ryan v. Capital Contractors, Inc.,* 679 F.3d 772, 779 (8th Cir. 2012) (quoting *Shaver v. Indep. Stave Co.,* 350 F.3d 716, 721 (8th Cir. 2003)).

For purposes of this Motion, Defendant will again acquiesce that Plaintiff was a member of a protected class and will concede that the behavior or running Plaintiff's gear up the flag pole took place. However, Plaintiff cannot show that she was a) exposed to unwelcome harassment (other than the flag pole incident); or b) that she was exposed to unwelcome harassment based on her race; or c) that any "harassment" affected a term or condition of her employment; or d) that the City knew or should have known about the harassing behavior, but failed to take proper action to alleviate it.

A. No evidence of unwelcome harassment or that it was based on race

The statements/actions that Plaintiff attributes as being discriminatory are off-handed comments directed or something that was on television.

The first incident the Plaintiff alleges to be discriminatory was when she was at the scene of an infant death. A white firefighter commented about the baby, who was African American, and allegedly said "it's sad to say, but that's the best thing that could have happened to that baby.") When questioned by Plaintiff why he would say such a thing, the other firefighter stated it was based on the poor living conditions. (Crudup Deposition Vol. I, 32: 5-18). There is nothing in that statement, as recited directly by Plaintiff, that could in anyway be deemed to be harassing to or even directed at her duet to her race.

The second incident, although Plaintiff cannot detail the conversation in any specific manner, was generally if political issues were being televised, Captain Schendt would sometimes make a comment "all Democrats could just kill themselves." (Crudup Deposition, Vol. I, 33: 21 - 34:10) Plaintiff did not believe such comments were directed at her, but felt they were "inappropriate." (Crudup Deposition, Vol. I, 32: 25 - 34:2). The parties can agree that making such a statement is probably not appropriate, but even in the workplace, people do have a right to freedom of speech. Again, Plaintiff admits that the statement was not directed toward her and certainly cannot be viewed by any reasonable juror that it was based on race. Not all African-Americans are Democrats and not all Democrats are African-Americans.

The third comment that Plaintiff alleges to be harassing was a time a television comedy program was on and there was a skit dealing with a Caucasian woman that identified as black. Captain Schendt alleged stated something to the effect "If that came to my house, I would shoot it." (Crudup Deposition, Vol. I, 36:4-18) Captain Schendt denies making that statement, but even

if we accept Plaintiff's statement as true, it is not clear how such a statement about a white woman could be viewed as harassing to the Plaintiff.

Then there was the situation with Captain Schendt where he told the fire candidates to "shut up and listen." Again, the undisputed facts indicated that that statement was made to both Plaintiff and fire candidate Mark Lukowski. Plaintiff feels like it was directed to her because she was the one arguing with Captain Schendt about it. Nonetheless, it is clear that the directive was given to both of them and it cannot reasonably be viewed as discriminatory statement based on Plaintiff's race.

The next incident occurred in March of 2020 wherein the fire crew was refueling a truck and one of the firefighters started pulling off before Plaintiff had reentered the truck. Plaintiff was not injured and according to the firefighter, it was a simple mistake. Even assuming all of the facts about this incident to be true, there is no way a reasonable jury could believe that this action was done based on Plaintiff's race.

The final incident was the running of Plaintiff's PPE up the flag pole.

Considering the relevant factors for determining whether conduct rises to the level of harassment indicates there was not harassment. First, the frequency of the discriminatory conduct (that is 6 instances over a year), does not support that Plaintiff's claims amount to harassment. That amounts to one incident once every other month. She was not called names. She was not inappropriately touched.

Moreover, the instances were not severe. The only one that could be broadly viewed as is physically threatening was the incident when the firefighter drove off. There is no evidence to support that this matter was anything other than a simple mistake.

B.   Did not affect a term or condition of her work

Plaintiff has no evidence whatsoever that any of these instances unreasonably interfered with an employee's work performance. *Pye v. Nu Aire, Inc.,* 641 F.3d 1011, 1018 (8th Cir. 2011).

The only thing that lead to change in her work conditions was the gear up the flag pole. Again, this one instance of harassment, if the Court sees it as, cannot be the basis for a hostile work environment claim. Plaintiff has no evidence that the five comments made or inadvertent actions taken over a one-year time period were so severe or pervasive enough to constitute a viable claim under the law. No reasonable person would not find the work environment, as described by Plaintiff, to be hostile or abusive as those terms are defined in the relevant case law. These matters did not. These are simple off-handed comments or actions that people made during the course of the work day. The work days for firefighters is obviously unique because they not only work together, they eat, sleep, work out, watch t.v. and cook together. The judicial system cannot regulate every day discourse between co-workers especially when they are in a home-like setting. Again, Plaintiff has no evidence that these incidents affected any term or condition of her work. The facts show that after she found out an investigation was started, she stopped coming to work. Before that, she was able to come to work perform as necessary and complete her probationary program in the Fire Department.

Other than the PPE up the flag pole, all Plaintiff alleges are very minor off-handed comments by co-workers, generally not even directed at the Plaintiff. These are not the types of behaviors that the federal law was intended to regulate. The Eighth Circuit has found that a hostile work environment did not exist in cases more severe than the present case. *See Duncan v. General Motors Corp.,* 300 F.3d 928 (8th Cir. 2002) (concluding that a co-workers request for a relationship, "four or five isolated instances of [the co-worker] briefly touching [plaintiff's] hand," the co-worker's request to the plaintiff for the plaintiff to draw his planter (where the co-worker

had a planter on his desk shaped like a man, with a hole in the man's pants allowing for a cactus to protrude), the coworker and another individual's creation and display of a poster that portrayed the plaintiff as the president and CEO of the "Man Hater's Club of America," and the co-worker asking the plaintiff to type up the beliefs of the "He–Men Women Hater's Club" did not meet the hostile work environment standard.). It is a difficult standard to be sure. However, "the high threshold necessary to sustain [Title VII] actions "filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes and occasional teasing." *Duncan,* 300 F.3d at 934 (internal citations omitted).

C.  City did not know about the "harassment"

Finally, Plaintiff cannot show that the Defendant knew or should have known about the harassing behavior. Plaintiff failed to take proper action to alleviate it, because she admits she did not confront any of the incidents to any superior within the Department or the City. There is no way the City even would have had constructive notice of the incidents. Plaintiff admits she never spoke to the people who were allegedly harassing her and she certainly did not report it through the chain of command until after she left Station 41 in April of 2020. Therefore, the City never had a chance to cure. With regard to the PPE up the flag pole, when she finally did report the occurrence – more than a month after the fact, an investigation was immediately undertaken. (Undisputed Fact 43) After the investigation was complete, although no one was disciplined, the Omaha Fire Department did change its standard operating procedures which prohibit such hazing as putting employees' gear up a flag pole. (See Undisputed Fact 54)

D. Constructive Discharge

As to Plaintiff claim of constructive discharge, Defendant argues that this claim has no merit. As the Eighth Circuit explains:

> Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit. *Klein [v. McGowan,]* 198 F.3d [705] at 709 [(8th Cir.1999)]. "[I]ntolerability of working conditions is judged by an objective standard, not the [employee's] subjective feelings." *Gartman v. Gencorp, Inc.,* 120 F.3d 127, 130 (8th Cir.1997) (internal citation and quotations omitted). First, the conditions created by the employer must be such that a reasonable person would find them intolerable. *Id.* Second, "the employer's actions must have been taken with the intention of forcing the employee to quit." *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1256 (8th Cir.1981). We have held, however, "[w]hen an employer denies a conscious effort to force an employee to resign ... the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions." *Hukkanen v. Int'l Union of Operating Eng'rs Hoisting & Portable Local No. 101,* 3 F.3d 281, 285 (8th Cir.1993). Finally, "to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly"; therefore, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *West v. Marion Merrell Dow, Inc.,* 54 F.3d 493, 498 (8th Cir.1995).

*Baker v. John Morrell & Co.,* 382 F.3d 816, 829 (8th Cir.2004). Plaintiff can present no objective evidence that the working conditions at the Fire Department were so bad as to lead a **reasonable person** to believe they had no choice but to leave. Moreover, there is no evidence whatsoever to support the contention that any action was with the intent of making her quit. Indeed the City everything it could to try to get her to stay. She was that employee who quits without giving her employer a chance to work out the problem and there the claim of constructive discharge must fail.

Defendant is entitled to summary judgment on these claims because, even giving Plaintiff the benefit of all reasonable assumptions, these allegations are not severe and pervasive or have affected a term or condition of Plaintiff's employment. Plaintiff alleges constructive discharge because she couldn't come back to work. The City afforded Plaintiff all the time she needed and was willing to work with her to come back. The City changed its policy as a result of her complaint, but Plaintiff wants flesh or money. In this end, this is simply a money grab for an employee that hasn't had a full-time job in a decade; choses to be underemployed and is looking for a windfall

from the citizens of this City. She should not be rewarded for this. There are no issues of material fact in dispute, and Defendant is entitled to judgment as a matter of law.

## III.

### EQUAL PROTECTION
### (Seventh Cause of Action)

Plaintiff alleges that the Defendant City of Omaha has discriminated against her by "establishing, maintaining and enforcing policies that create or foster a sexually hostile work environment, by treating African-Americans differently, and by retaliating against those, including Plaintiff, who complained about" unlawful actions. (First Amended Complaint ¶ 98, Doc. #56). A municipality may be held liable under Section 1983 only if a municipal custom or policy caused the deprivation of the right protected by the constitution or federal laws. *Monell v. Department of Social Services,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). A policy may be either a policy statement, ordinance, regulation, or decision officially adopted and promulgated by the municipality's governing body. *St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988). Municipal officials by their own actions may subject the government to Section 1983 liability if they have final policymaking authority. *Id.* at 123, 108 S.Ct. at 924.

> Official policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy. State law identifies who has the final authority to make policy. Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials.

*Ricketts v. City of Columbia, Mo.,* 856 F.Supp. 1337, 1343-44 (W.D. Mo. 1993), *aff'd,* 36 F.3d 775 (8th Cir. 1994) (internal quotations and citations removed).

Plaintiff cannot show that the Omaha Fire Department has any official act or policy for running fire gear up a flag pole. It has occurred before, and other non-black males have been

subjected to this type of treatment, but there is no "policy" that supports this behavior. This behavior is certainly not condoned by anyone with actual policy making authority (i.e. the Fire Chief, the Mayor or the City Council) and Plaintiff will not be able to produce any such evidence at trial.

To the extent that Plaintiff's Equal Protection claim alleges that the City violated equal protection by retaliating against her; that claim must fail. The Defendant can find no case law that supports the contention that there is an established right under the Equal Protection Clause to be free from retaliation. See *Burton v. Arkansas Sec'y of State,* 737F.3d. 1219, 1237 (8th Cir. 2013); *Hurd v. City of Lincoln,* No. 4:16CV3029, 2018 WL 10468025 at *22, July 23, 2018

Consequently, Defendant is entitled to Summary Judgment on Plaintiff's Equal Protection claim.

## IV.

## RETALIATION
### (Eighth, Ninth and Tenth Causes of Action)

Finally, Plaintiff has brought Retaliation causes of actions under Title VII, NFEPA and § 1981. As with the discrimination claim, it is proper for the Court to analyze all of Plaintiff's retaliation claims under the same analysis. *See Knapp v. Ruser*, 901 N.W.2d 31, 43 (Neb. 2017) "[T]he NFEPA is patterned after federal Title VII and that it is appropriate to look to federal court decisions construing Title VII for guidance with respect to the NFEPA." *Spanel v. Cent. Cmty. Coll.,* No. 8:18-CV-380, 2022 WL 310153, at *11 (D. Neb. Feb. 2, 2022).

"Title VII prohibits employers from retaliating against an employee who is engaged in a protected activity, which can be either opposing an act of discrimination made unlawful by Title VII ... or participating in an investigation under Title VII...." *Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002) (citations omitted). "To survive a motion for summary judgment

on a retaliation claim, [Plaintiff] either must offer direct evidence of retaliation or create an inference of retaliation under the *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)] burden-shifting framework." *Yearns v. Koss Constr. Co.*, 964 F.3d 671, 674 (8th Cir. 2020) (internal quotation omitted). Because Plaintiff will not be able to produce any direct evidence of retaliation, this Court should apply the *McDonnell Douglas* burden-shifting framework to this retaliation claim.

Under this framework, Plaintiff must establish a prima facie claim of retaliation to survive summary judgment by providing evidence from which a jury could conclude that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between her protected activity and the adverse employment action. *Fezard v. United Cerebral Palsy of Cent. Ark.*, 809 F.3d 1006, 1011 (8th Cir. 2016) (citation omitted). However, if Defendant comes forward with evidence of a legitimate, nonretaliatory basis for the adverse employment action, Plaintiff must then point to some evidence that Defendant's asserted basis is pretextual. *Id.* (citation omitted).

> Not everything that makes an employee unhappy is an actionable employment action. *See Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1245 (8th Cir. 1998). Rather, an adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities. *See Williams v. City of Kansas City, MO,* 223 F.3d 749, 753 (8th Cir.2000) (citing *Scusa v. Nestle U.S.A. Co.,* 181 F.3d 958, 969 (8th Cir.1999)).

*LaCroix v. Sears, Roebuck, & Co.,* 240 F.3d 688, 691 (8th Cir. 2001)

Plaintiff fails to make out a prima facie case of retaliation. Giving Plaintiff the benefit of every fact, it would appear that the protected activity Plaintiff engaged in was on or about April 14, 2020, when another firefighter, Sheena Glover, made a complaint to the Mayor, the Fire Chief, the Labor Relations Director and the Fire Union President about the alleged discriminatory conduct of running Plaintiff's fire gear up the flagpole on March 3, 2020.

Unfortunately, Plaintiff cannot show that she suffered any adverse employment action after that date. As discussed above, Plaintiff does not allege any adverse action in her Complaint and when asked what adverse actions she suffered after she made her complaint, the only two things she can point to are:

1) she found a dirty surgical mask in her boot at Station 61 on or about April 17, 2020 (See Undisputed Fact 48); and

2) someone (unknown) tightened her helmet at Station 65 on or about May 4, 2020 (Undisputed Fact 49).

Assuming those two incidents did occur and were intentional acts (which Plaintiff has absolutely no proof of either), they do not amount to an adverse employment action. Plaintiff does not know who engaged in this alleged behavior and therefore, there is no way of even knowing if those persons were even aware of the complaint she made on April 14, 2020. But again assuming that she can present some evidence that these two incidents occurred, the undisputed facts show that Plaintiff was not fired, demoted, or reassigned after making the complaint, nor did she lose pay, benefits or seniority. Plaintiff had been on administrative leave for two years pursuant to her doctor's recommendations. Up until her voluntary resignation on May 30, 2022, she was still a member of the Fire Department and would have been reassigned to a fire station or some other duty when she wanted to return to her duties.

However, Plaintiff did not exhaust her retaliation claim. Congress (and the State of Nebraska) has set for a statutory framework under which Title VII employment cases must be prosecuted. As Judge Pratt set forth in *Foster v. Roberts Dairy Co., LLC,* 372 F.Supp.2d 1165, 1172 (D.Neb. 2005):

> "In order to initiate a claim under Title VII a party must timely file a charge of discrimination with the EEOC and receive a right-to-sue letter." *Stuart v. General*

*Motors,* 217 F.3d 621, 630 (8th Cir.2000). The requirement that an individual must first exhaust his or her administrative remedies is important to Title VII**'s** goals because it puts the employer on notice of the alleged violation and promotes voluntary compliance and conciliation. *Williams v. Little Rock Mun. Water Works,* 21 F.3d 218, 222 (8th Cir.1994).

Under Neb. Rev. Stat. § 48-1118(2), a complaining party must submit a "written charge of violation of the Nebraska Fair Employment Practice Act…within three hundred days after the occurrence of the alleged unlawful employment practice…" In essence, this is what is generally known as the statute of limitations in employment cases.

A copy of Plaintiff's charge of discrimination is attached to the Index of Exhibits as Exhibit 8. That document was is dated 11/7/20. Plaintiff's last day at work was six months prior in May 2020.

Plaintiff may argue that she need not file an administrative charge with respect to claims that are "like or reasonably related to" an alleged unlawful unemployment practice that the plaintiff did properly exhaust. *See, e.g., Anderson v. Block,* 807 F.2d 145, 148 (8th Cir.1986). She might argue that because her retaliation claim is "like or reasonably related" to the claim of discrimination based on race and sex that she presented to the EEOC, nothing more was required to exhaust her retaliation claim.

The Court advises to liberally construe the administrative charges, and if allegations in a complaint are "like or reasonably related to the substance of charges timely brought before the EEOC," the claimant has sufficiently exhausted his administrative remedies. *Lindeman v. Saint Luke's Hosp. of Kan. City*, 899 F.3d 603, 608 (8th Cir. 2018) (quoting *Williams v. Little Rock Mun., Water Works*, 21 F.3d 218, 222 (8th Cir. 1994). Judge Rossiter recently opined:

> However, each specific claim of employment discrimination must be one that "reasonably could be expected to result from the administrative charge." *Parisi v. Boeing Co.,* 400 F.3d 583, 585 (8th Cir. 2005). In *Richter v. Advance Auto Parts, Inc.*, the plaintiff checked the boxes on the EEOC form for "race" and "sex," but

did not check the box for "retaliation." The Eighth Circuit rejected the plaintiff's contention that her retaliation claim was exhausted, as "[t]he EEOC evidently never considered whether Richter has a meritorious claim of unlawful retaliation, and never initiated any conciliation process on that matter with the employer." *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 853 (8th Cir. 2012).

*Carter v. Wessels*, No. 8:20CV324, 2020 WL 6707203, at *3 (D. Neb. Nov. 13, 2020).

Although Plaintiff alleged retaliation in her initial complaint and First Amended Complaint, she did not distinctly and separately present this claim in the EEOC charge, and they are not "like or reasonably related" to any claims asserted there. *See Parisi*, 400 F.3d at 584-86. In her EEOC charge, Plaintiff did not check any box to indicate retaliation and did not make any statement or claim of retaliation whatsoever. The additional narrative information Plaintiff provided in the charge does not suggest a claim for retaliation. Even a liberal reading cannot help make such a claim a reasonably foreseeable result of Plaintiff's administrative filing and the Court should not "invent [ ], *ex nihilo*, a claim which simply was not made." *Parisi*, 400 F.3d at 585 (quoting *Shannon v. Ford Motor Co.*, 72 F.3d 678, 685 (8th Cir. 1996)). In short, Plaintiff failed to raise a retaliation claim in her EEOC charge. She failed to exhaust administrative remedies with respect to that claim, and it must be dismissed.

Moreover, Plaintiff cannot meet the prima facie requirements of retaliation, and therefore, Defendant is entitled to Summary Judgment on this claim for a plethora of reasons.

## CONCLUSION

For all the reasons set forth herein, Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P 56 must be granted.

DATED this 9th day of November, 2022.

CITY OF OMAHA, Defendant


By  s/Michelle Peters
    MICHELLE PETERS, #20021
    Deputy City Attorney
    Attorney for Defendant
    804 Omaha/Douglas Civic Center
    1819 Farnam Street
    Omaha, NE 68183
    (402) 444-5115
    michelle.peters@cityofomaha.com


## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d)(3), I hereby certify this brief complies with the requirements of NECivR 7.1(d)(1). Relying on the word-count function of Microsoft Office Word 2010, this document contains 9,065 words. The word-count function was applied to all text, including the caption, headings, footnotes, and quotations.

s/ Michelle Peters
Deputy City Attorney


## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2022, I electronically filed the foregoing **BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which sent notification to such filing to the following: Potso Mahlangeni-Byndon, 2016 Fowler Ave., Omaha, Ne 68110.

/s/Michelle Peters