**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| JANE CRUDUP, | ) | **CASE NO.  8:21CV0045** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF OMAHA, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Prepared and submitted by:
POTSO MAHLANGENI-BYNDON Bar Number: 43031
Attorney for Plaintiff
2016 Fowler Avenue
Omaha, Nebraska 68110
(402) 570-1287
potso@byndonlaw.com

## INTRODUCTION

Ms. Jane Crudup first applied to serve as an Omaha Firefighter in 2015. Ms. Crudup traveled this path simply because of her duty to serve the public and provide a helping heart. But in 2015, it was not her time. She continued to follow and work towards her dream and applied again in 2017—with an eventual hire in December 2018. In 2019, when Ms. Crudup formally began her journey toward firefighter confirmation, she was one of two black female firefighters in Omaha. Ms. Crudup had one singular goal—to help as many people as possible. A career in firefighting was unlikely unavailable to someone like Ms. Crudup maybe 30 or 40 years ago, but through Ms. Crudup, America has the right to reinvent herself. Unfortunately, during her time as a firefighter, Ms. Crudup experienced deeply disparaging treatment, justified as: "*It was just a joke.*" However, Ms. Crudup chose to speak out and never let the truth die through Title VII's outright rejection of harassment, discrimination, and retaliation.

Based on the arguments below, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SHOULD BE DENIED IN ITS ENTIRETY.

## I. FACTUAL STATEMENTS

### a. *Just Shut up and Listen*

Defendant hired Plaintiff, Ms. Jane Crudup, a black firefighter, on January 14, 2019. (First Amended Complaint ¶¶ 13-14). At the time, Ms. Crudup was one of two black female firefighters employed by Defendant out of over 680 firefighters. (Exhibit 14 ¶ 2). In April 2019, Ms. Crudup completed the rigorous firefighter training academy and was assigned to Station 42 to complete her probationary training. (First Amended Complaint ¶ 16). Fire Chief Daniel Olsen described

firefighter training as an "all hands on deck approach," meaning firefighters who are the closest rank to the fire candite [sic] will have involvement in the [sic] that process." (Olsen Deposition 24:10-18). While at Station 42, Ms. Crudup was required to sign a 'Candidate Expectation' document, which stated, "keep your mouth shut and your ears open." (Exhibit 8, pp. 4).

In May 2019, Ms. Crudup transferred as a probationary candidate to Station 41. (First Amended Complaint ¶ 21). There, Ms. Crudup reported to white males, Supervisors Scott Schendt and Todd Dippel. (First Amended Complaint ¶ 22). When Ms. Crudup arrived at Station 41, Supervisors Dippel and Schendt met with Ms. Crudup to go over candidate expectations. (Crudup Deposition 30:18-21). During that meeting, Supervisors Dippel and Schendt explained to Ms. Crudup that, at Station 41, there would be "jokes" played on her as a part of her training process. (Crudup Deposition 31:14-32:3). Supervisor Schendt further stated that Ms. Crudup needs to learn how to take a joke to have some longevity at the Fire Department. (Schendt Deposition 41:13-42:1).

During a training exercise, Ms. Crudup addressed a work-related concern with a module led by Fire Apparatus Engineer Heath Reyzlik to Supervisor Schendt. (Crudup Deposition 109:3-12; Crudup Deposition 42:5-44:6; 109:3-12). Instead of addressing her concern, Supervisor Schendt told Ms. Crudup to "shut up and listen." (Schendt Deposition 39:22-25; Crudup Deposition 109:3-15). During her time at Station 41, Ms. Crudup was subjected to comments made by Supervisor Schendt and Firefighter Chris Vacek. These comments included an instance when Supervisor Schendt spoke in the presence of Ms. Crudup, specifically wanting to 'shoot it'—regarding a white woman who self-identified as black on a television show. (Crudup Deposition 35: 24-36:18; 33:19-34:16). During an emergency call, a black baby was found dead; when returning to the station, Firefighter Vacek described the death to Ms. Crudup as the best thing to

happen to a black baby. (Crudup Deposition 32:17-33:18). During Ms. Crudup's candidacy, Supervisors Schendt and Dippel had her phone number, but they did not include her in Station 41's group text. (Crudup Deposition 49:4-18).

On March 3, 2020, Ms. Crudup reported to Station 41 after an Emergency Medical Technician testing located off-site at a training academy. (Crudup Deposition 58:15-59:4). When she reported to Station 41, she found her helmet and firefighter coat—with her name affixed, also known as "PPE," hanging from a public flagpole. (Crudup Deposition 59:8-24; 64:12-25). It was displayed in an order where the helmet was above the coat as if a body was hanging. *Id.* Ms. Crudup, hurt, dehumanized, enraged, and yelling—went into the firehouse bay, where Firefighter Derek McMillin confronted Ms. Crudup to ask if she was okay. (Crudup Deposition 65:13-66:15; 66:19-67-11). Ms. Crudup communicated with her mentor, fellow black firefighter Sheena Glover, and shared what had transpired. (Crudup Deposition 67:25-68:4). Ms. Crudup took a picture of her helmet and firefighter coat hanging from a flagpole and subsequently took it down. (Crudup Deposition 68:20-25). Ms. Crudup's supervisors saw or were aware of her helmet and firefighting coat hanging from a flagpole and took no corrective action. (Exhibit 13, pp. 12-13 (Answer 4-5)). Supervisor Dippel spoke with the firefighters regarding the incident but chose not to speak to Ms. Crudup. (Dippel Deposition 38: 23-39:3; Exhibit 9, p. 10). Supervisor Schendt did not talk to Ms. Crudup about the incident. (Schendt Deposition 33:15-24). Supervisors Schendt and Dippel stated that Ms. Crudup's helmet and firefighter coat was hung as a corrective action. (Schendt Deposition 63:2-13; 69:3-14; Dippel Deposition 96:6-9). Firefighter Reyzlik, a white male, hung Ms. Crudup's helmet and firefighting coat from a public flagpole. (Exhibit 13, p. 11 (Answer 2)).

Shortly after the hanging of Ms. Crudup's helmet and firefighter coat, on March 5, 2020, Ms. Crudup went on a routine fuel run for Station 41's firetruck with Firefighter Vacek and

Supervisor Schendt. After Mr. Crudup was done pumping gas and attempted to get back on the firetruck, Firefighter Vacek drove off while Ms. Crudup was getting back on, thus creating a dangerous situation. (Exhibit 14 ¶ 2). Between March 5, 2020, and April 4, 2020, Village Inn donated food to Station 41 and their respective families due to the Covid-19 restaurant closure. Ms. Crudup picked up various items, later stolen from her by Firefighter Vacek. (Crudup Deposition 50:2-52:22).

On April 2, 2020, Ms. Crudup completed her probationary period. She was confirmed as a Firefighter, and on April 4, 2020, she was transferred to Station 61. (First Amended Complaint ¶ 39). Between March 3, 2020, and April 12, 2020, Ms. Crudup communicated with Firefighter Glover on how to address the hanging of her helmet and firefighter coat. Ms. Crudup decided to see if she could mentally heal and wait until Firefighter's Confirmation; then, Firefighter Glover would send the complaint and carbon copy Ms. Crudup due to fear of retaliation. (Crudup Deposition 71:10-17; Exhibit 14 ¶ 3).

On April 12, 2020, on behalf of Ms. Crudup, Firefighter Glover notified Fire Chief Olsen and Labor Relations Director Mr. David Grauman, putting Defendant on notice and alleging discrimination and harassment. (Crudup Deposition 70:3-12). The email contained the picture of Ms. Crudup's firefighting coat and helmet ("PPE") hanging from a flagpole with her allegations of discrimination and harassment. (Exhibit 5, p. 6). As the investigation into Ms. Crudup's claims was ongoing, while at Station 65, a used mask in the early onset of the Covid-19 pandemic was stuffed into her boot. (Crudup Deposition 78:10-79:2). While at Station 61, Ms. Crudup's helmet was tampered with in course of employment. (Crudup Deposition 74:15-75:8). Due to the totality of actions inflicted upon Ms. Crudup in May 2020, she was medically unable to work. (Crudup Deposition 82: 2-11, Exhibit 14 ¶ 5).

b.    **Discrimination and Harassment Couched as Jokes and Hazing**

In response to Ms. Crudup's complaint, the Mayor of Omaha, Jean Stothert, notified Mr. Grauman, the Labor Relations Director for the City of Omaha. In an email, Mayor Stothert stated, "Please investigate this. We cannot allow this to happen." (Exhibit 5, p. 4). Mr. Grauman responded to Mayor Stothert with the reply, "This behavior will not be tolerated." (Grauman Deposition 30:10-24). Subsequently, Mr. Grauman had a conversation with Ms. Deb Sander, his supervisor, wherein he stated, "if this is what it appears to be… [I am] going to probably end up firing any individual that had anything to do with this act." (Grauman Deposition 30:25-31:10).

On April 16, 2020, Mr. Grauman met with Ms. Crudup pursuant to his duties as an investigator. (Exhibit 5, pp. 7-11). Mr. Grauman stated that when he saw the picture of Ms. Crudup's helmet firefighter coat hanging from a flagpole, it offended him; it offended his supervisor, the mayor, and the Fire Chief. (Grauman Deposition 117:21-118:23). Fire Chief Olsen called the hanging of Ms. Crudup's helmet and firefighting coat hanging from a flagpole by a white firefighter "poor taste." (Olsen Deposition 48:24-48:2). During Mr. Grauman's interview, Ms. Crudup provided details of her complaints. (Crudup Deposition 32:17-33:18; 33:19-34:16; 35:24-36:18; 50:2-52:22). After meeting with Ms. Crudup, Mr. Grauman wrote in an email to his supervisor stating, "…we're going to thoroughly investigate and address this complaint" and further ". . .we're willing to do whatever we can to ensure that [Ms. Crudup] is comfortable working at OFD and that she enjoys her job" and "discrimination and harassment will not be tolerated at the OFD or anywhere else at the city." (Exhibit 5, pp. 11; Grauman Deposition 39:11-40:16).

On May 6, 2020, Mr. Grauman provided a 48-hour interview notice pursuant to the investigation to Fire Apparatus Engineer Reyzlik, Firefighter McMillin, and Firefighter Vacek

with potential charges to include Article 6, Sections 1(e) and (j), Executive Orders, S-33-16 and S-21-13 and any related OFD [Standard Operating Procedure] SOP regarding code of conduct and/or discrimination. (Grauman Deposition 52: 21-54:8).

In May 2020, the Fire Department created Standard Operating Procedure Personal 8-0, Harassment Prevention Policy, for the purpose of Ms. Crudup's complaint. (Olsen Deposition 58:5-11). Ms. Crudup was never shown this policy or told about it while actively employed. (Crudup Deposition 87:6-22). On June 5, 2020, Mr. Grauman charged Battalion Chief Doug Krysl with the responsibility of investigating Ms. Crudup's allegations of 1) a used mask being placed in her boot in the early onset of the Covid-19 pandemic and 2) Ms. Crudup's helmet being tampered while working. (Grauman Deposition 72:2-73:11).

On June 11, 2020, Mr. Grauman responded to Ms. Crudup's investigation inquiry, stating: "… rest assured that your claim is being thoroughly investigated as the City takes these matters seriously." (Exhibit 6, p. 13; Grauman Deposition 64:23-65:22).

Less than 24 hours later, Mr. Grauman concluded Ms. Crudup's investigation and provided a written memorandum to Human Resources Director Deb Sander. (Exhibit 9, p. 4; Deposition Grauman 68:25-70:16). Mr. Grauman found that Ms. Crudup was not subjected to harassment or discrimination, and no Fire Department policies or codes of conduct were violated. *Id.*

Between June 16, 2020, and July 24, 2020, while the investigation was still ongoing—yet concluded, Mr. Grauman and Mr. Krysl emailed back and forth regarding the scope of the investigation, mode, and interviewing persons of interest. (Exhibit 8, pp. 1-3; 5-6; 8-10). On June 30, 2020, Mr. Krysl submitted his first investigatory report to Mr. Grauman. On July 16, 2020, Mr. Krysl submitted a second investigatory report to Mr. Grauman. (Exhibit 8, pp. 7, 11). On July

24, 2020, Mr. Grauman reported his investigatory finding to Ms. Crudup, Fire Chief Olsen, and Human Resources Director Deb Sander. (Grauman Deposition 90:4-14; Exhibit 9, p. 2).

### c. The Discriminatory Sham Investigation

Mr. Grauman found that all ten of Ms. Crudup's allegations of harassment, discrimination, and retaliation were unsubstantiated and exonerated the subjects of the investigation. (Exhibit 9, p. 1; Grauman Deposition 104:10-106:19). Mr. Grauman further stated in his findings that it is "undisputed that [Ms. Crudup] was subjected to "pranks" during [her] candidacy at OFD…," and he conceded that "jokes" were played on her. (Grauman Deposition 106:20-107:2; 115:12-16; 117:21-25; Exhibit 9, p. 1). Mr. Grauman defined Ms. Crudup's helmet and firefighter coat hanging from a flagpole by a white firefighter as a "means of corrective action." (Grauman Deposition 107:3-13; Exhibit 9, p. 1). Fire Chief, Olsen, was unaware of this training policy, as "joking" or hazing a candidate as a training method is not something the Fire Department permits. (Olsen Deposition 32: 9-15). However, when Fire Chief Olsen received Mr. Grauman's report in July 2020, he did nothing to follow up or correct it. (Olsen Deposition 37:18-39:21).

Mr. Grauman's investigation indicated that Ms. Crudup's supervisors permitted firefighters to conduct this type of training—specifically hazing. (Exhibit 9, pp. 10-11). Ms. Crudup was the only black firefighter at Station 41 to have their helmet and firefighting coat hung. (Grauman Deposition 163:12-164:3; Dippel Deposition 96:14-16). As Labor Relations Director, Mr. Grauman has investigated complaints from city employees related to discrimination, harassment, and retaliation and has "frequently" reviewed Collective Bargaining Agreement articles related to firefighter discipline. (Grauman Deposition 124:21-125:21; 181:14-182:5). In his report and memorandum, Mr. Grauman used the words: "joke," and "haze," to debunk Ms.

Crudup's claims and exonerate the perpetrators. (Grauman Deposition 126:24-127:16). Prior to Ms. Crudup's complaint, Mr. Grauman *never* unsubstantiated a discrimination or harassment complaint by identifying it as a "joke" or hazing. (Grauman Deposition 129:1-16). Fire Chief Olsen received and accepted Mr. Grauman's report. (Olsen Deposition 36:22-38:21).

### d.   Professional Standards Officer Doug Krysl Failed to Investigate

In investigating Ms. Crudup's allegations of discrimination, harassment, and retaliation, Mr. Grauman relied upon the assistance of Professional Standards Officer Doug Krysl. (Grauman Deposition 50:23-51-23; 155:15-21). Mr. Grauman gave Mr. Krysl the responsibility of conducting a specific Fire Department investigation into allegations made by Ms. Crudup. (Grauman Deposition 95:3-17). Mr. Grauman relied on Mr. Krysl's report to develop one finding. (Grauman Deposition 80:25-81:24).

Mr. Krysl's first investigatory report regarding Mr. Crudup's allegations was created on June 30, 2020, over two months after she reported the claims and two weeks *after* Mr. Grauman concluded the investigation. (Exhibit 9, p. 13). Mr. Krysl's second investigatory report was created on July 16, 2020, over three months after Ms. Crudup reported the allegations and over a month *after* Mr. Grauman concluded the investigation. (Exhibit 9, p. 14). Overall, Mr. Krysl asked only three questions per allegation and no probing investigatory-related questions. Mr. Krysl's report is silent on what Standard Operating Procedures or Collective Bargaining Agreement authority he considered. (Exhibit 9, pp. 13-14).

Since at least 2014, the Fire Department has had no formal specific anti-harassment/discrimination training. (Exhibit 13, pp. 13-14, (Answer 13)). In 2019, Mr. Krysl was subject to a discrimination investigation made by a black firefighter. (Exhibit 13, pp. 15-16 (Answer 20)). Mr. Grauman concluded that his findings do not preclude the Fire Department from

taking corrective action. (Exhibit 9, p. 12). The Fire Department did not independently investigate Ms. Crudup's claims to determine if there was a violation of a Collective Bargaining Agreement or Standard Operating Procedure, despite their ability to do so. (Olsen Deposition 35:4-9; Grauman Deposition 93:5-94:14). Mr. Grauman has never sustained a charge of discrimination by a black firefighter. (Grauman Deposition 15:4-9).

### e. <u>Seven Different Policies, Five Different Applications, One Victim of Discrimination Harassment, and Retaliation</u>

Fire Chief Olsen stated that Standard Operating Procedures, Collective Bargaining Agreement, and Human Resource Policy apply to the entire Fire Department, and he expects the department to adhere to them. (Olsen Deposition 38:22-40:17). Mr. Grumman's investigatory report does not mention any Fire Department Policy or Collective Bargaining Agreement as a considering factor—yet he concluded there was no violation. (Exhibit 9, pp. 1-2; Grauman Deposition 123:25-124:7). Fire Chief Olsen stated he was unaware if Mr. Grauman considered any specific Fire Department policy in his investigation. (Olsen Deposition 36:8-12; 50:6-8; 55:5-12; 60:16-22; 62:7-8; 66:7-24). Ms. Crudup's supervisors described her helmet and fire coat hanging from a flagpole by a white firefighter as a corrective action. (Dippel Deposition 86:19-89:19; 95:9-96:4; Schendt Deposition 59:8-10; 74:22-75:6).

i. *Executive Order No. S-33-16* (Exhibit 3, pp. 2-3).

When Mr. Grauman first saw the picture of Ms. Crudup's helmet and firefighting coat hanging, he felt it could be "a massive violation of this executive order." (Grauman Deposition 154:11-15; 154:19-155:4). Further, Mr. Grauman stated that he could see how the hanging of Ms. Crudup's helmet and firefighter coat from a flagpole by a white firefighter could violate the

executive order. *Id.* Supervisor Dippel stated that the individual determines a violation of this order; if Ms. Crudup's found hanging her helmet and firefighting from a flagpole by a white firefighter as offensive, then it could violate the executive order. (Dippel Deposition 75:23-76-10).

ii. *Personnel Policy 3-1, Equal Employment Opportunity Policy* (Exhibit 3, pp. 7-8).

Mr. Grauman stated that he could see how the hanging of Ms. Crudup's helmet and firefighting coat from a flagpole by a white male firefighter would violate this policy. (Grauman Deposition 159:23-25).

iii. *Human Resource Policy Workplace Violence and Prevention and Response #30,* (Exhibit 3, p. 16).

Mr. Grauman failed to consider this policy in his investigation, even though it applies to Defendant's employees, and he was familiar with it. (Grauman Deposition 166:12-18; 168:23-24).

iv. *Personnel Policy 8-0, Harassment Prevention Policy* (Exhibit 3, pp. 21-24).

In May 2020, Fire Chief Olsen created this policy as a direct result of the hazing inflicted upon Ms. Crudup and to clarify further that it would not be tolerated. (Olsen Deposition 31:12-23). Although this policy was created directly from the hazing inflicted upon Ms. Crudup, this policy was not shared with Ms. Crudup until her deposition—23 months later. (Crudup Deposition 87:6-22). Mr. Grumman's investigatory report does not mention this policy as a considering factor—yet he concluded there was no violation. (Grauman Deposition 123:25-124:7). Mr. Grauman stated that he could see how the hanging of Ms. Crudup's helmet and firefighter coat from a flagpole by a white firefighter could violate this policy. (Grauman Deposition 174:21-24). Further, Mr. Grauman stated that the hazing inflicted upon Ms. Crudup could violate this policy. (Grauman Deposition 174:25-175:3).

v. *City Ordinance, Section 13-89 Unlawful Practices—Employers* (Exhibit 10, p. 1).

Mr. Grauman defined privilege of employment as an employee's right to work in an environment free from discrimination and harassment, and, in that case, the hanging of Ms. Crudup's helmet and firefighter coat from a flagpole by a white firefighter would arguably violate this ordinance. (Grauman Deposition 177:18-179:1). Regarding the hazing inflicted upon Ms. Crudup, Mr. Grauman stated that it could potentially violate this ordinance depending on the "facts specific to the hazing." (Grauman Deposition 179:2-8). Mr. Grumman's investigatory report does not mention this policy as a considering factor—yet he concluded there was no violation. (Grauman Deposition 123:25-124:7).

*vi. Collective Bargaining Agreement Article 14 Non-Discrimination* (Exhibit 10, p. 2).

Mr. Grauman failed to consider this Article in his investigation. (Grauman Deposition 180:23-16). Mr. Grauman stated that he could see how a white firefighter hanging Ms. Crudup's helmet and firefighting coat from a flagpole could violate this Article. (Grauman Deposition 180:17-20).

*vii. Collective Bargaining Agreement Article 6 Discharge, Disciple, and Counselings* (Exhibit 10, p. 3).

Mr. Grauman stated that the hanging of Ms. Crudup's firefighter helmet and coat from a flagpole by a white firefighter was unbecoming of a firefighter. (Grauman Deposition 184:20-185:11). When Mr. Grauman saw the picture of Ms. Crudup's gear hanging from a flagpole, it looked offensive, and from her perception, it could be offensive. *Id*. Mr. Grauman stated that the Fire Department has the discretion to identify charges based upon causes and complaints other than those listed in the Collective Bargaining Agreement—yet the Fire Department failed to. (Exhibit 13, p. 14, (Request 16)).

**f.** **Discrimination and Harassment Damaging Effects on Ms. Crudup**

Since May 2020, Ms. Crudup has been medically unable to work as a Firefighter due to harassment and discrimination. (Exhibit 7 ¶ ¶ 6, 8; Exhibit 12, p. 8). Due to harassment and discrimination inflicted upon Ms. Crudup, she required psychiatric care to address various PTSD-related symptoms. (Exhibit 12, p. 8; Exhibit 7 ¶ ¶ 3, 6). On October 27-28, 2020, Defendant required Ms. Crudup to submit to a Fit for Duty exam. (Exhibit 11, p. 5) Examiner Dr. Conner concluded that Ms. Crudup was psychologically "Unfit for Duty" as a firefighter due to the actions inflicted upon her by Defendant. (Exhibit 11, p. 11-14). Defendant was notified of Ms. Crudup's "Unfit for Duty" status. (Grauman 197:14-198:4).

*Article 21* of the Collective Bargaining Agreement, in pertinent part, states that an employee who is a member of the Fireman's Pension System who shall sustain injuries or sickness arising out of and in the course of her employment, which render one temporarily unfit for active duty shall be paid his full salary for the period of such temporary disability but not to exceed (365) three hundred sixty-five calendar days. (Exhibit 11, p. 15).

When describing the Injured on Duty (IOD) process, Mr. Grauman stated, "the city is very liberal [in] how we administer IOD," and the City usually errs on the employee's side. (Grauman 189:2-190:1). Mr. Grauman stated that the IOD is more beneficial to an employee than the Nebraska Statutes would provide and that it is "just granted" it would be granted under *Article 21*. (Grauman Deposition 202:2-203:10; 205:10-15).

Defendant never provided Ms. Crudup with her Fit for Duty exam results, and she was never given her Unfit for Duty benefits as provided under *Article 21*. (Grauman Deposition 196:12-16; Exhibit ¶ 9).

Since May 2020, Ms. Crudup has worked extensively with her treatment providers to return

13

to work as a firefighter. (Defendant's Exhibit 14; Exhibit 7 ¶ ¶ 10-11). On May 30, 2022, Ms. Crudup resigned from her position as a firefighter due to harassment and discrimination sustained by Defendant. (Exhibit 7 ¶ 11).

## II. RESPONSE TO DEFENDANT'S UNDISPUTED FACTS

1-7.  Undisputed

8. **DISPUTED:** Ms. Crudup stated that she did not recall if Captains Dippel or Schendt told her that if the "joking" or "kidding" around started to affect her job, she should come to them and they would put a stop to it. Ms. Crudup stated she did not trust them. (Crudup Deposition 31:24-32:8).

9-13. Undisputed.

14. **DISPUTED:** Ms. Crudup stated she was the only one talking to Captain Schendt when he responded shut up and listen, while he was looking at her. (Crudup Deposition 45:7-19)

15-16. Undisputed.

17. **DISPUTED:**  *First*, Ms. Crudup has never seen a firefighter's helmet and coat hanging from a flagpole beside hers, hung by a white firefighter. Ms. Crudup is unaware of the act being identified and labeled as common practice. (Exhibit 7 ¶ 7). *Second*, Mr. Grauman and Assistant Fire Chief John McCormick stated that it is not possible to ascertain white firefighters who participated in or facilitated the action of hanging a helmet and firefighter coat from a flagpole. (Exhibit 13, p. 4, (Answer 3)). *Third,* Defendant's affidavits allegedly show that two white firefighters, whose gear went up the flagpole from 1998 to March 2, 2020—meaning common practice is defined as twice in 22 years, and only white men. (Defendant's Exhibits 11-12). *Fourth*, Firefighter Reyzlik, the perpetrator who hung Ms. Crudup's helmet and firefighting coat from a flagpole, stated that "gear is only messed with when someone leaves it behind **and** is out of

service.*" (Exhibit 9, p .9). *Fifth,* Fire Chief Olsen described the act of hanging gear from a flagpole as "poor taste" not common practice. (Olsen Deposition 46:12-48:2).

18. **DISPUTED**: Firefighter Vacek stated that Firefighter Schack had his gear run up a flagpole when he was a candidate. (Exhibit 9, p. 9). Now, Firefighter Schack is saying that this is not true, and it was a shirt instead.

19 and 20: **DISPUTED**: Mr. Grauman and Assistant Fire Chief McCormick stated that it is not possible to ascertain white firefighters who participated in or facilitated the action of hanging a helmet and firefighter coat from a flagpole. (Exhibit 13, p. 4, (Answer 3)).

21-24. Undisputed.

25a. Undisputed 25b. Undisputed 25c.Undisputed 25d. **DISPUTED:** The directive was given in the presence of Candidate Lukowski. Ms. Crudup was the only one talking to Captain Schendt when he responded, "shut up and listen," while he was looking at her. (Crudup Deposition 45:7-19). 25e. Undisputed.

26. **DISPUTED:** On April 12, 2020, Firefighter Glover sent an email to Mr. Grauman at the direction of Ms. Crudup. (Crudup Deposition 69:24-70:12).

27. Undisputed.

28. **DISPUTED:** Ms. Crudup was told she needed to bring her turnout gear with her to Fire Training—**not** EMS testing, which is what she went to on March 3, 2020, and multiple people did not bring their gear with them to EMS training, including Candidate Heather Hessler. (Crudup Deposition 62:4-23).

29. **DISPUTED:** Firefighter Glover said gear is off-limits; they shouldn't be touching your gear. (Crudup Deposition 68:12-19).

30-33. Undisputed.

34. **DISPUTED**: Ms. Crudup did not say it was not offensive; she further described it as distasteful. Ms. Crudup did not forget her PPE when it was hung from a flagpole by a white firefighter; she left it intentionally. (Crudup Deposition 64:12-20, Defendant's Undisputed Fact 27).

35. **DISPUTED**: Ms. Crudup interacted with Firefighter McMillin, wherein he came up to her to talk, but because of the incident, Ms. Crudup was yelling, screaming, and upset. (Crudup Deposition 108:9-16; 65:13-14).

36-43. Undisputed.

44. **DISPUTED:** At the time of this conversation, Ms. Crudup was no longer at Station 41. So, Mr. Grauman's offer to move Ms. Crudup would mean moving her from Station 61 or 65 to another station. (Crudup Deposition 79:21-80:7).

45-49. Undisputed.

50: **DISPUTED:** Ms. Crudup was on unpaid medical leave. (First Amended Complaint Filing ¶ 56)

51: Undisputed.

52. **DISPUTED:**  White firefighters told Mr. Grauman that white firefighters had their gear run up a flagpole; however, his investigation did not independently indicate that. (Exhibit 9, pp. 8-10). Mr. Grauman and Assistant Fire Chief McCormick stated that it is not possible to ascertain white firefighters who participated in or facilitated the action of hanging a helmet and firefighter coat from a flagpole. (Exhibit 13, p. 4, (Answer 3)). Mr. Grauman's investigation independently indicated that the only firefighter with their PPE hung from a flagpole was Ms. Crudup. (Grauman Deposition 163:12-164:3).

53-56: Undisputed.

16

## STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the nonexistence of any genuine issue of material fact. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 157 (1970). Therefore, if the defendant does not meet its initial burden with respect to an issue, summary judgment must be denied, notwithstanding the absence of opposing affidavits or other evidence. *Adickes, 398* U.S. at 159-60; C*ambee's Furniture, Inc. v. Doughboy Recreational, Inc.*, 825 F.2d 167, 173 (8th Cir. 1987).

Facts are viewed in the light most favorable to the nonmoving party, "in order to defeat a motion for summary judgment, the non-moving party cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." *Carter v. St. Louis University*, 167 F.3d 398, 401 (8th Cir. 1999); *Ghane v. West*, 148 F.3d 979, 981 (8th Cir. 1998).

In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations. *Kenney v. Swift Transp. Co.,* 347 F.3d 1041, 1044 (8th Cir. 2003). Summary judgment should seldom be granted in discrimination cases. *Heaser v. Toro,* 247 F.3d 826, 829 (8th Cir. 2001). In passing on a motion for summary judgment, it is not the court's role to decide the merits. *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986) (on motion for summary judgment, district court should not weigh evidence or attempt to determine truth of matter). The court must simply determine whether there exists a genuine dispute of material fact. *Bassett v. City of Minneapolis,* 211 F.3d 1097, 1107 (8th Cir. 2000).

### III. ARGUMENT

1. **RACE DISCRIMINATION: Title VII, NFEPA, §1981**
   **(First, Second, and Third Cause of Action)**

The Hanging of a Black Firefighter's Helmet and Coat with Name Affixed on a Public Flagpole

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer "…to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1).  First, evidence of discrimination may be direct, by a plaintiff showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action. *Arraleh v. Cnty. Of Ramsey,* 461 F.3d 967, 974 (8th Cir. 2006).

Second, indirect evidence may prove discrimination through the burden-shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff must first demonstrate the ability to prove the four elements of a prima facie case, which slightly varies depending upon the alleged adverse employment action. *Id*.; *Krenik v. Cnty. Of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A prima facie case is established where (1) the plaintiff is a member of a protected class, (2) the plaintiff is qualified to perform the job**,** (3) the plaintiff suffered an adverse employment action, and (4) the plaintiff was treated differently than similarly situated persons outside of the protected class *Schoffstall v. Henderson*, 223 F.3d 818, 825 (8th Cir. 2000). The prima facie case, in the absence of an explanation from the employer, creates a rebuttable presumption of discrimination. *Krenik, 47 F.3d at 958.*

Defendant conceded that Plaintiff is a member of a protected class and was qualified for the position of a Firefighter. (Filing No. 61, p. 13). Defendant also admitted Firefighter Reyzlik, a

white male, hung Ms. Crudup's firefighting helmet and coat from a flagpole. (Exhibit 13, p. 11 (Answer 2)). The undisputed record also establishes that Ms. Crudup's supervisors saw or were aware of her helmet and fire coat hanging from a flagpole and took no corrective action. (Exhibit 13, p. 12 (Answer 4-5)).

Since May 2020, Ms. Crudup has been unable to work as a firefighter. First, constructively placed on unpaid leave—then discharged due to PTSD symptomologies caused by Defendant. (Exhibit 7 ¶¶ 8-10). Additionally, since May 2020, Ms. Crudup's psychiatrist, Dr. Jensen, deemed Ms. Crudup unable to work as a firefighter. (Exhibit 7 ¶ 10). In October 2020, Defendant's examiner, Dr. Conner, concluded that Ms. Crudup was psychologically "Unfit for Duty" as a firefighter due to the actions of the white firefighters and the subsequent ratification by Mr. Grauman and Fire Chief Olsen. (Exhibit 11, pp. 11-14; Exhibit 7 ¶ 9). Since May 2020, Ms. Crudup has attempted to mentally return to her career as a firefighter through various treatment modalities and providers. (Exhibit 7 ¶ 10). Ms. Crudup resigned from her work as a firefighter due to the overwhelming PTSD-associated symptomologies; therefore, constructively discharged. (Exhibit 7 ¶ 11).

An adverse action was implicated when the direct actions of Defendant left Ms. Crudup unable to work, and she was forced to go on unpaid leave and subsequently resign. *See Wilkie v. Dep't of Health and Human* Servs., 638 F.3d 944, 955 (8th Cir. 2011). (An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge.) (emphasis added). As Judge Hansen specified:

> A person who has suffered a forced unpaid medical leave of absence, from which she is unable to return and which resulted from objectively intolerable working

19

conditions, is in no better position than one who was forced to quit as a result of objectively intolerable conditions. In either case, the employer has, through objectively intolerable conditions, forced the employee out of active service. We believe it is sufficient for a plaintiff to prove that an employer deliberately rendered working conditions intolerable and thus forced the employee to permanently "leave" the employment; the employee need not prove that she technically "quit" in every case. (*White v. Honeywell, Inc.*, 141 F.3d 1270, 1279 (8th Cir. 1998).

Clearly, Defendant's actions forced Ms. Crudup to "leave" the employment without pay. In their brief, Defendant erroneously relies on *Jackman.* In *Jackman,* the employer-provided Ms. Jackman favorable employment benefits, including the opportunity to use donated sick leave from the leave bank. *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 805 (8th Cir. 2013). Moreover, Ms. Jackman did not allege the state has forced her to take leave, either paid or unpaid. *Id*. In contrast, Defendant's discrimination and harassment caused Ms. Crudup's inability to work. (Exhibit 7 ¶ 10). Ms. Crudup exhibits symptoms consistent with PTSD and requires ongoing treatment. (Exhibit 7 ¶ 8). Ms. Crudup's psychiatrist rendered her unable to work as a firefighter since May 2020. (Exhibit 7 ¶ 10). Even Defendant's examiner, Dr. Conner, rendered Ms. Crudup "Unfit for Duty" due to the harassment and discrimination inflicted upon her. (Exhibit 11, pp. 12-14). Ms. Crudup has been on unpaid forced medical leave since 2020, then constructively discharged on May 30, 2022, due to the direct action of Defendant. In *Jackman*, the plaintiff simply alleged typical "work-related stress." *Jackman, 728 F.3d at 803*.

Each of the two adverse actions above—forced unpaid medical leave and constructive discharge, can individually or in combination satisfy an adverse action inflicted upon Ms. Crudup. Genuine issues of material fact exist.

Defendant recently produced affidavits in support of their Motion to Dismiss Plaintiff's Discrimination and Hostile Work Environment claims. Defendant's theory and argument are harrowing. Therefore, to address Defendant's affidavit argument, Plaintiff will provide separate

facts and analysis section and proceed with due care in outlining the pertinent facts with legal analysis.

The heart of Defendant's argument is simply this: The discriminatory and harassing acts done to Ms. Crudup at the hands of Defendant cannot be because they were also done to white firefighters. To support this theory, Defendant recently obtained affidavits from Firefighters Joseph Tisthammer, Matthew Salmon, and Eric Schack—all white males. (Defendant's Exhibit 11-13).

**Facts:**

In their affidavits, Firefighter Tisthammer stated that his firefighter gear was run up a flagpole in 2017; Firefighter Schack stated that in 2018, his firefighter shirt was run up a flagpole (for an unknown reason) and lastly, Firefighter Salmon stated that—in 1998 or early 1999, his firefighter gear was run up a flagpole. (Defendant's Exhibits 11-13). Further, Supervisor Dippel stated that Firefighter Lukowski's firefighting gear was hung from a flagpole. (Dippel Deposition 103:24-104:3). Moreover, throughout the evidence, Supervisor Dippel, Supervisor Schendt, and Mr. Grauman consistently stated that hanging a firefighter's coat and helmet from a flagpole was a common occurrence and standard practice. (Schendt Deposition 33:5-14; 35:25-36:5; Exhibit 9, p. 1).

This is factually inaccurate and legally flawed, which Plaintiff will address separately below.

**Factual Inaccuracies or Inconsistencies:**

1. Firefighter Tisthammer stated that he had firefighter gear run up the flagpole when ***he was outside the station*** and that he was supposed to have it with him. (Defendant's Exhibit 11).
    i. Firefighter Salmon stated that ***while working at*** Station 41, he had his gear run up the flagpole when he was supposed to have it with him. (Exhibit 12).

    ii.   Firefighter Schack stated that he had his **_shirt run up a flagpole_** (for an unknown reason) and that he never left his gear at the station, so he never had it run up the flagpole. (Defendant's Exhibit 13).

    iii.   Firefighter Reyzlik, the perpetrator who hung Ms. Crudup's helmet and firefighting coat from a flagpole, stated that "gear is only messed with when someone leaves it behind **AND _is out of service._**" (Exhibit 9, p. 9).

Now, we have at least four different conflicting hanging stories from Defendant.

2. On April 21, 2020, Firefighter Almond stated that the current [probationary] candidate's gear was rung up the flagpole on that date. (Grauman Deposition 122:20-123:2). However, that affidavit is conveniently missing as there was likely no candidate at the station on April 21, 2020, since candidates were just confirmed as firefighters on April 2, 2020. (Filing No. 57 p. 1; *Admitting* ¶ 39).

3. On two separate inquiries, Supervisor Dippel stated that Firefighter Lukowski's firefighting gear was hung from a flagpole. (Dippel Deposition 75:23-76:10; 103:24-104:3). However, that turned out to be untrue, as Firefighter Lukowski denied such and did not include that fact in his affidavit. (Defendant's Exhibit 10; Exhibit 9, p. 8).

4. Firefighter Vacek stated that Firefighter Schack had his gear run up a flagpole. (Exhibit 9, p. 9). That turned out to be untrue as Firefighter Schack denied that in his affidavit—however, he now states that he had his **_shirt_** run up the flagpole for an unknown reason. (Defendant's Exhibit 13).

5. Defendant's justification for the hanging is: "if you forget your gear, it goes up the flagpole." (Schendt Deposition 36:1-5; Defendant's Exhibit 13). Then did shirtless Firefighter Schack forget to put on a shirt for work since it went up the flagpole? (Defendant's Exhibit 13).

Plaintiff takes note of shirtless Firefighter Schack's affidavit explanation of why his gear was **_not_** run the flagpole (he didn't forget it)—yet calculated reticence of why his shirt **_was_** run up the flagpole (an omitted reason).[1]

6. Firefighter Reyzlik stated that Firefighter Solmon's gear was hung from a flagpole. (Exhibit 9, p. 9). However, Firefighter Solmon's affidavit stated that this occurred last century, in late 1998 or early 1999. (Defendant's Exhibit 12). Firefighter Reyzlik was hired on July 24, 2002, almost **_four_** years after this allegedly happened to Firefighter Salmon. (Exhibit 4).

---

[1] Plaintiff further notes, Defendant's inconsistent use of "PPE" in their brief. "PPE" stands for Personal Protective Equipment, which generally means a firefighter's firefighting coat and helmet. In light of shirtless Firefighter Schack's affidavit, Defendant now attempts to include 'shirt' in the definition of protective equipment to maintain a thread of consistency amongst the stories.

7. Firefighter McMillin stated that Firefighter Solmon's gear was run up the flagpole. (Exhibit 9, p. 8). However, Firefighter Solmon's affidavit stated that this occurred in the 20th Century—late 1998 or early 1999. Firefighter McMillin started working at Station 41 in late 2017 or early 2018, **almost 20 years** after this allegedly happened to Firefighter Salmon. (Exhibit 9, p. 8).

8. After Firefighter Solmon's gear was hung up on the flagpole in late 1998 or early 1999, nobody had their gear hung up on the flagpole until 2017 when it happened to Firefighter Tisthammer. This 19-year gap is at odds with Defendant describing the hanging act inflicted upon Ms. Crudup as a common occurrence and standard practice. (Exhibit 9, p. 1).

9. Mr. Grauman never interviewed Firefighter Solmon while investigating Ms. Crudup's complaint. (Exhibit 9, pp. 7-10).

10. Plaintiff's interrogatory request to Defendant, dated November 10, 2021:
    **Plaintiff's Interrogatory 3:** Name all white firefighters currently employed who, in the course of employment, participated or facilitated in the act of suspending a helmet and coat from a flagpole in that order that belonged to an African American firefighter as a training mechanism without their consent.
        i. **Defendant's Answer**: *The Omaha Fire Department does not track this information, so it is not possible to answer this question.* (Exhibit 13, p. 4 (Interrogatory 3)).

However, on October 25, 2022, and November 1, 2022, Defendant was able to ascertain white (just not black) firefighters who had their helmets and coats hung from a flagpole. It seems with white firefighters and for a summary judgment motion—part of Plaintiff's interrogatory has become coincidentally possible to track and answer.

11. Defendant produced no affidavits from a black firefighter whose firefighting coat and helmet were hung from a flagpole. This invariably means, outside Ms. Crudup, no black firefighter candidate in over 22 years was subjected to this so-called common occurrence or standard practice after it first happened in 1998. In practicality, Defendant's facts suggest the dubious anomaly of Ms. Crudup being the first black firefighter candidate in at least 22 years to have their firefighting coat and helmet hung from a flagpole out of "a lot of white guys" that it has allegedly happened to. (Schendt Deposition 65:19-23).[2]

12. Outside of Ms. Crudup, in 22 years (1998-2020) of firefighter candidates, Defendant's evidence shows by chance that two white males (**and no non-white**) candidates were allegedly subjected to the hanging of their firefighting helmet and

---

[2] Although not relevant from a Title VII prima facie standpoint, as discrimination and harassment are individualized harms, however, this fact further undercuts Defendant's credibility. Defendant is now presenting evidence that surmises since 1998, **only** white male candidates have left their PPE. This is an illogical dead end for something identified as common practice and standard procedure for department with 680 firefighters in the course of at least 22 years of firefighter candidates.

coat from a flagpole, with 19 years between the first and second hanging—even though this was a common occurrence and standard practice.

13. Mr. Grauman's investigation independently indicated that the only firefighter with their firefighter helmet and coat hung from a flagpole was Ms. Crudup. (Grauman Deposition 163:12-164:3; Dippel Deposition 96:14-16).

14. No black firefighter at Station 41 has had their helmet, and firefighting coat hung from a flagpole except for Ms. Crudup. (Grauman Deposition 163:12-164:3).

15. Ms. Crudup has never seen a firefighter's helmet and coat hanging from a flagpole outside hers—hung by a white firefighter. (Exhibit 7 ¶ 7). Firefighter Crudup is unaware of such practice being identified and labeled as common practice at Station 41. (Exhibit 7 ¶ 7). Firefighter Crudup has not participated in this act of discrimination or harassment. (Exhibit 7 ¶ 7).

Here, Defendant's affidavit experiment has imploded their credibility. When opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, Defendant's timeline of events, facts, and actors would leave a reasonable jury to believe that Defendant's hanging story is contrived and poorly rehearsed. Issues of new material facts exist.

**Legal Inaccuracies**:

From a legal perspective, the heart of Defendant's strategy is to showcase themselves as "Equal Opportunity Discriminators." Essentially, if Defendant can show that they hang everyone's gear from a flagpole or harass equally, it simply cannot be discrimination or harassment. However, this disturbing theme is unsupported by statutory interpretation or case law. Title VII "tells us, three times—including immediately after the words "discrimination against"—that our focus should be on individuals, not groups." *Bostock v. Clayton Cty*., 140 S. Ct. 1731, 1740 (2020). In sum, discrimination is an individualized Constitutional Tort.

Here, Defendant attempts to sack an individual black firefighter's request for redress by

producing fresh affidavits to illustrate they are an "Equal Opportunity Discriminator." First, this is factually incomplete, as the alleged individual(s) who harassed or hung white firefighters' gear in 1998 and 2017 were not the same individuals who harassed or discriminated against Plaintiff. Secondly, Title VII protects employees as individuals from biased employment decisions, not groups. As such, Defendant's zealous search to find another black firefighter, to say that "he has never felt harassed, or discriminated against and did not feel Ms. Crudup has been either," clearly illustrates to the Court that Defendant does not understand discrimination or harassment. (Undisputed Fact 53).

As Justice Gorsuch puts it: "…[A]n employer who fires both Hannah and Bob for failing to fulfill traditional sex stereotypes doubles rather than eliminates Title VII liability. . ." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1742-43 (2020). Similarly, Defendant's attempt to produce evidence, in the form of fresh affidavits, to show that one black firefighter was treated the same as two white firefighters have now doubled rather than eliminated Defendant's liability.

## 2. HARASSMENT/HOSTILE WORK ENVIRONMENT: Title VII, NFEPA, §1981 Fourth, Fifth and Sixth Causes of Action

The Mock Lynching.

To establish a hostile work environment claim, the plaintiff must show that: (1) she is a member of a protected class; (2) she was exposed to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing behavior, but failed to take proper action to alleviate it. *Arraleh v. Cnty. Of Ramsey*, 461 F.3d 967, 978 (8th Cir. 2006).

To demonstrate that harassment altered the terms and conditions of one's employment, the

conduct alleged must be severe and pervasive, both objectively and subjectively. *Id*. at 979. Offhand comments and isolated incidents of offensive conduct (unless extremely serious) do not constitute a hostile work environment. *Burkett v. Glickman*, 327 F.3d 658, 662 (8th Cir. 2003). When determining whether a work environment is hostile or abusive, we examine all of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Arraleh,* 461 F.3d at 979.

<u>Ms. Crudup was exposed to unwelcome harassment.</u>

Defendant conceded that the plaintiff is a member of a protected class and that a white firefighter hung Ms. Crudup's firefighter helmet and coat from a flagpole. (Filing No. 61, p. 18; Exhibit 13, p. 11 (Answer 2)).

Under the totality of the circumstance approach, a work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it "into a series of discrete incidents…." *Burns v. McGregor Elec. Indus., Inc.,* 955 F.2d 559, 564 (8th Cir. 1992). "Instead, the trier of fact must keep in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." *Id. Also See King v. Hillen, 21 F.3d 1572, 1583* (Fed. Cir. 1994) (plaintiff's perception of any one incident of harassment should be determined in the context of all incidents (citing *29 C.F.R. § 1604.11(b)*)).

The job of a firefighter is a unique position because you work, sleep, live, and conduct activities of daily living during your work shift. (Exhibit 7 ¶ 11). There is no 'going home for the day.' To work as a firefighter, Ms. Crudup was required to live with her co-workers amid discrimination and harassment. (Exhibit 7 ¶ 11). While at Station 42, Ms. Crudup was required to

sign a 'Candidate Expectation' document stating, "keep your mouth shut and your ears open." (Exhibit 8, p. 4). Instead of addressing Ms. Crudup's concern during a training exercise, Supervisor Schendt told her to "shut up and listen." (Schendt Deposition 39:22-40:16). Supervisor Schendt further stated that Ms. Crudup needs to learn how to take a joke in order to have some longevity at the Fire Department. (Schendt Deposition 41:13-42:1).

During her time at Station 41, Ms. Crudup was subjected to comments made by Supervisor Schendt and Firefighter Vacek, including an instance when Supervisor Schendt spoke in the presence of Ms. Crudup, explicitly wanting to 'shoot it'—regarding a white woman who self-identified as black on a television show and Firefighter Vacek telling Ms. Crudup, death is the best option for a black baby. (Crudup Deposition 35:24-36:18; 33:19-34:16; 32:17-33:18).

As the harassment continued, on March 5, 2020, Ms. Crudup went on a routine fuel run for Station 41's firetruck with Firefighter Vacek and Supervisor Schendt. (Exhibit 9, p. 6; Exhibit 7 ¶ 4). After Ms. Crudup was done pumping gas and attempted to get back on the firetruck, Firefighter Vacek tried to drive off while Ms. Crudup was getting back on, thus creating a dangerous situation. *Id*.

Between March 5, 2020, and April 2, 2020, Village Inn donated food to Station 41 and their respective families due to the Covid-19 restaurant closure. Ms. Crudup picked up various items later stolen from her by Firefighter Vacek. (Crudup Deposition 50:2-52:22).

As the investigation into Ms. Crudup's claims was ongoing, in April 2020, a used mask in the early onset of the Covid-19 pandemic was stuffed into her boot during her employment. (Crudup Deposition 78:10-79). It is essential to note the extreme seriousness of a used mask being in someone's belongings at this time of the pandemic. (Exhibit 7 ¶ 5).

27

While at Station 61, Ms. Crudup's helmet was tampered with during the course of employment. (Crudup Deposition 74:15-75:8). Due to the totality of actions inflicted upon Ms. Crudup in May 2020, she was medically unable to continue work. (Crudup Deposition 82:2-11; Exhibit 12, p. 8, Exhibit 7 ¶ 10).

In their motion, Defendant asks this Court to make a fact-finding determination that these incidents, separate or in the aggregate, do not constitute harassment because Ms. Crudup was not touched inappropriately by anyone at the fire station—as if that unalleged fact serves the only indicator for Defendant to understand harassment. Defendant further asks the Court to make the credibility determination that harassment did not occur because Ms. Crudup's harassers meant it all to be just a "joke." A genuine issue of material fact exists.

The harassment was based on a protected characteristic.

Mr. Grauman stated in his investigatory finding that it is undisputed that Ms. Crudup was subjected to what he described as "pranks" at work. (Exhibit 9, p. 1; Grauman Deposition 106:20-107:2; 117:21-25). Mr. Grauman conceded that what he described as "jokes" were "played" on Ms. Crudup. (Grauman Deposition 115:12-16). Mr. Grauman was told that white firefighters had their gear run up a flagpole by Ms. Crudup's harassers; however, his investigation did not independently indicate that. His investigation independently revealed that Ms. Crudup was the only firefighter with their helmet and coat hung. (Grauman Deposition 163:12-164:3). Mr. Grauman's investigation indicated that only Ms. Crudup was harassed, and no black firefighter at station 41 had their helmet and firefighting coat hung from a flagpole outside of her. (Grauman Deposition 163:12-164:3; Exhibit 9, pp. 7-11).

Before newly obtained affidavits submitted by Defendant last month, Defendant stated that it was impossible to ascertain white firefighters who participated in or facilitated the action of

hanging a helmet and firefighter coats from a flagpole. (Exhibit 13, p. 4, (Answer 3)). Defendant's inconsistent statements, as well as the affidavit analysis provided in the discrimination section, *supra*, creates a genuine issue of material fact.

In their brief, Defendant relies on an unrelated fact not alleged by Ms. Crudup to uncut harassment, such as, ". . .but nobody at Station 41 showed the plaintiff derogatory photos or videos." (Undisputed Fact 22-23). Plaintiff will give Defendant grace and assume that was an error, as this was not pleaded or alleged. To assert that Ms. Crudup was not singled out based on what her harassers and their friends told Labor Relations Director, Mr. Grauman would require an admission of double hearsay, a credibility analysis, and for the Court to accept Defendant's blatantly contradicted affidavit account.[3] *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999). (It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue.)

<u>The harassment inflicted on Ms. Crudup affected a term, condition, or privilege of employment.</u>

Since May 2020, Ms. Crudup has been medically unable to work as a firefighter due to inflicted harassment and discriminatory treatment. (Exhibit 7 ¶ 10). Since May 2020, Ms. Crudup has worked extensively with her treatment providers, attempting to return to work. (Exhibit 7 ¶ 10). However, Ms. Crudup's PTSD symptoms, including nightmares, anxiety, depression, hypervigilance, and sleep disturbance, persisted. (Exhibit 7 ¶ 8, 10). On May 30, 2022, Ms. Crudup resigned from her position as a Firefighter as she was medically unable to work due to mental trauma caused by harassment and discrimination. (Defendant's Exhibit 9).

---

[3] For example, the record indicates that Mr. Grauman was told by Firefighter Reyzlik that Firefighter Salmon's firefighting helmet and coat were hung from a flagpole. (Exhibit 9, p. 9). Firefighter Salmon indicated that that happened in 1998, however, Firefighter Reyzlik was hired four years later in, 2002. (Exhibit 4).

In the Eighth Circuit, "once there is evidence of improper conduct and subjective offense, the determination of whether the conduct rose to the level of abuse is largely in the hands of the jury." *Howard v. Burns Bros., Inc., 149 F.3d 835, 840.* "The test is not whether work has been impaired, but whether working conditions have been discriminatorily altered." *Hathaway v. Runyon*, 132 F.3d 1214, 1223 (8th Cir. 1997) (citing *Harris* v *Forklift Sys.* 510 U.S. 17, 25 (Scalia, J., concurring).

When Ms. Crudup arrived at Station 41, her supervisors explained that " jokes " would be played on her during training. (Dippel Deposition 44:10-20; Schendt Deposition 25:22-26:17). Instead of addressing a legitimate training concern, Supervisor Schendt told Ms. Crudup to "shut up and listen." (Schendt Deposition 39:22-40:16). Further, Supervisor Schendt stated to Ms. Crudup, that she needs to learn how to take a joke to have some longevity at the Fire Department. (Schendt Deposition 41:13-42:1).  At the time, Fire Chief Olsen was unaware of this training policy at Station 41, as hazing, a candidate as a training method, is not something the Fire Department allows Captains to permit. (Olsen Deposition 32:9-15). Moreover, hanging a Firefighter's helmet and coat from a flagpole is not an official policy used by the Fire Department. (Exhibit 13, p. 11, (Answer 3)).

Labor Relations Director Mr. Grauman stated that when he saw the picture of Ms. Crudup's helmet and firefighter coat hanging, it offended him; it offended his supervisor [Deb Sander], the mayor, and the Fire Chief. (Grauman Deposition 117:21-118:23). However, Mr. Grauman later described the harassment Ms. Crudup endured as "jokes." (Grauman Deposition 115:12-16). Further, Fire Chief Olsen called the hanging of Ms. Crudup's helmet and firefighting coat from a flagpole by a white firefighter: "Poor Taste." (Olsen Deposition 48:24-48:2). This discriminatorily

abusive work environment deeply detracted Ms. Crudup's job performance and prevented her from remaining on the job. (Exhibit 7 ¶ 10).

    <u>The employer knew or should have known about the harassing behavior but failed to take proper action to alleviate it.</u>

    Defendant admitted that Ms. Crudup's supervisors saw or were aware of her helmet and fire coat being hung from a flagpole and took no corrective action. (Exhibit 13, p. 12-13 (Answer 4-5)). In April 2020, when the harassing behaviors were reported to Labor Relations Director, Mr. Grauman, he felt it could be *"a massive violation."* (Grauman Deposition 154:11-15; 154:19-155:4). Mr. Grauman further stated to the Mayor of Omaha that "this behavior will not be tolerated." (Grauman Deposition 30:10-24). Additionally, Mr. Grauman said to his supervisor, "Discrimination and Harassment will not be tolerated at the OFD or anywhere else at the city." (Grauman Deposition 39:11-40:19).

    The Fire Department failed to investigate Ms. Crudup's complaint to determine if policies were violated. (Exhibit 9, p. 12). Mr. Grauman exonerated the white firefighters who harassed Ms. Crudup, identifying the overall treatment of her as a "joke" or "hazing." (Exhibit 9, p. 1; Grauman Deposition 104:10-106:19). The white firefighters who inflicted harm upon Ms. Crudup received no disciplinary action. (Exhibit 13, p. 11 (Answer 2)). Liability lies "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." *Sandoval v. Am. Bldg. Maint. Indus.*, 578 F.3d 787, 802 (8th Cir. 2009) (quoting *Fall v. Ind. Univ. Bd. of Tr.*, 12 F. Supp. 2d 870, 882 (N.D. Ind. 1998).

    Here, Defendant created a work environment permeated with discriminatory intimidation, ridicule, and insult, causing Ms. Crudup harm. (Exhibit 7 ¶ 10). A genuine issue of material fact exists.

Lastly, in Defendant's brief, they state that Plaintiff cannot show that Defendant knew or should have known about the harassing behavior and never had a chance to cure it. This is yet another credibility head-scratcher, as Defendant admitted that Ms. Crudup's supervisors were aware that her helmet and fire coat were hung from a flagpole and took no corrective action. (Exhibit 13, pp. 12-13 (Answer 4-5)).  Assuming *arguendo*, if that is Defendant's stance, then the 103-day investigation undertaken by Defendant into Ms. Crudup's complaints was a charade, thus retaliatory—as no cure could have resulted since Defendant was never told.

### 3. <u>EQUAL PROTECTION</u>
**Seventh Cause of Action**

Section 1983 provides a cause of action for the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by any person under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory. (*Mendoza v. United States Immigration & Customs Enf't*, 849 F.3d 408, 418 (8th Cir. 2017). Local governments could also be sued under Section 1983 for constitutional deprivations visited pursuant to governmental custom or official policies. *Id.*

A municipality may be liable under Section 1983 if the governmental body itself subjects a person to a deprivation of rights or causes a person to be subjected to such deprivation. *Connick v Thompson*, 563 U.S. 51, 60 (2011). Under Section 1983, local governments are responsible only for their own illegal acts. *Id.* A plaintiff must prove that action pursuant to official policy caused injury. *Id.* Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. *Id.* The fact that a particular official, even a policy-making official, has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *Davison v. City of Minneapolis, Minn., 490 F.3d 648, 660 (8th*

*Cir. 2007)*. To establish liability, the individual in question must have authority under state law or have power delegated by an official who possesses such authority. *Id.*

Second, liability can be established under a 'failure to train*.' 'Connick,* 563 U.S. at 61. To establish liability, a failure to train must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact. *Id.* Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policy-makers choose to retain that program. *Id.* A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference, though the Supreme Court has conjectured that some consequences of a failure to train may be so evident that a pattern of violations is unnecessary. *Id.* at 62-63.

Third, the plaintiff may be able to prove liability under Section 1983 by illustrating the alleged misconduct was so pervasive among the non-policy-making employees as to constitute a custom or usage with the force of law. *See McGautha v. Jackson Cnty., Mo*., *Collections Dept.,* 36 F.3d 53, 56 (8th Cir. 1994) (quoting *Monell v. Dept. of Social Svcs*., 436 U.S. 658, 690-91 (1978)). To establish liability under this theory, Plaintiff must demonstrate: (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policy-making officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation. *Snider v. City of Cape Girardeau,* 752 F.3d 1149, 1160 (8th Cir. 2014).

Here, since at least 2014, the Fire Department has had no formal specific anti-

harassment/discrimination training. (Exhibit 13, pp. 13-14, (Answer 13)). Policymaking official Fire Chief Olsen described firefighter training as an "all hands on deck approach," meaning firefighters who are the closest rank to the fire candite [sic] will have involvement in the [sic] that process." (Olsen Deposition 24:10-18). When Ms. Crudup arrived at Station 41, her supervisors explained to her that, there would be "jokes" played on her during training. (Schendt Deposition 25:22-26:17). Ms. Crudup's supervisors permitted firefighters to conduct this type of training, specifically—hazing. (Exhibit 9, pp. 10-11). Ms. Crudup's supervisors stated that her gear being hung from a flagpole by a white firefighter was a corrective action. (Schendt Deposition 69:3-11; Dippel Deposition 79:9-80:8; 95:9-96:4). On July 24, 2020, policymakers, Human Resources Director Deb Sander and Fire Chief Olsen received Mr. Grauman's investigatory report, which dismissed Ms. Crudup's claims of harassment and discrimination as "jokes." (Olsen Deposition 36:22-38:21; Exhibit 9, p. 2). Fire Chief Olsen did not follow up on Mr. Grauman's report, thus condoning its findings. (Olsen Deposition 36:22-38:21).

Defendant relies on *Ricketts v. City of Columbia, Mo.,* 856 F.Supp. 1337, 1343-44 (W.D. Mo. 1993), *aff'd,* 36 F.3d 775 (8th Cir. 1994) (internal quotations and citations removed):

> Official policy involves a deliberate choice to follow a course of action made from among various alternatives by an official who has the final authority to establish governmental policy. State law identifies who has the final authority to make policy. Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials.

In congruence, Labor Relations Director Mr. Grauman's findings were unreviewable and not constrained by the official policies of superior officials. Mr. Grauman stated that when he saw the picture of Ms. Crudup's helmet and firefighter coat hanging, it offended him; it offended his supervisor [Deb Sander], the mayor [Jean Stothert], and the Fire Chief [Olsen]. (Grauman

Deposition 117:21-118:23).

Regarding Defendant hazing Ms. Crudup, Mr. Grauman stated that it could potentially violate *Omaha City Ordinance,* § 13-89 (an ordinance that applies to the Fire Department) depending on the *"facts specific to the hazing"*—notwithstanding hazing is a criminal act. (Grauman Deposition 179:2-8). Additionally, when defining hazing, Mr. Grauman stated, in the context of the Fire Department, "I think hazing, joking, pranking could potentially be used interchangeably as a way to describe trying to use humor as a way to coach and teach." (Grauman Deposition 130:13-22).

On June 12, 2020, while the investigation was ongoing for six more weeks, Mr. Grauman's sent his final memorandum, which confirmed Defendant hazing Ms. Crudup, to policymaker Human Resources Director Deb Sander. (Exhibit 9, p. 4-11). Ms. Sander did nothing to follow up, question, or correct it. *Id.* On July 24, 2020, Mr. Grauman sent his investigatory report to Ms. Sander—and again, she did nothing to follow up, question, or correct it. (Exhibit 9, p. 2). On July 24, 2020, when Fire Chief Olsen received Mr. Grauman's report, he also did nothing to follow up, question, or correct it. (Olsen Deposition 37:18-38:21). As a Labor Relations Director, Mr. Grauman has "frequently" reviewed Collective Bargaining Agreement articles related to firefighter discipline. (Grauman Deposition 124:21-125:21; 181:14-182:5). Prior to Ms. Crudup's complaint, Mr. Grauman never unsubstantiated a discrimination or harassment complaint by identifying it as hazing. (Grauman Deposition 129:1-16).

In accordance, from the onset of Ms. Crudup's complaint, policymaker Fire Chief Olsen was aware of Mr. Grauman's duty to investigate. (Olsen Deposition 34:3-9). In May 2020, at the direction of Fire Chief Olsen, the Fire Department created a Harassment Prevention Policy to address Ms. Crudup's complaint. (Olsen Deposition 58:5-11). In the policy, 'hazing' is defined

with *mens rea*, *actus reus*, and the term is used thirteen times. (Exhibit 3, pp. 21-24). This invariably means by May 2020; Fire Chief Olsen was acutely aware of Mr. Grauman's ongoing investigation. However, Fire Chief Olsen stated that no violation occurred, despite being "well-versed" in Article 6 of the Collective Bargaining Agreement: '*Disciplinary Action – Cause.'* (Olsen Deposition 37:18-39:21; 64:11-66:21).

Without question, policymakers, Fire Chief Olsen and Ms. Sander deliberately chose to follow Mr. Grauman's report, which condoned hazing—a criminal act in the state of Nebraska.[4] This caused Ms. Crudup harm. A genuine issue of triable facts exists.

### 4. RETALIATION: Title VII, NFEPA, §1981
### Eighth, Ninth, and Tenth Cause of Action

The plaintiff establishes a prima facie case by showing that: (1) she engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct. *Arraleh, 461 F.3d at 977.*

Protected activity includes opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII. *Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002). A plaintiff need not establish the conduct that what she opposed was, in fact, discriminatory but rather must demonstrate good faith and reasonable belief that the underlying challenged conduct violated the law. *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 714 (8th Cir. 2000). The scope of the anti-retaliation provision extends beyond workplace-

---

[4] See *Pembaur v. City of Cincinnati*, 474 U.S. 469 (1986). In *Pembaur*, the Court held that "municipal liability may be imposed or for a single decision by municipal policymakers under appropriate circumstances," even when the decision was made not by its "properly constituted legislative body" but rather by "other officials 'whose acts or edicts may fairly be said to represent official policy."

related or employment-related retaliatory acts and harm. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.*

On April 12, 2020, at the direction of Ms. Crudup, Firefighter Glover emailed Fire Chief Olsen and Labor Relations Director Mr. Grauman, putting Defendant on notice of alleged discrimination and harassment. (Crudup Deposition 70:3-12). As the investigation into Ms. Crudup's claims was ongoing, a used mask in the early onset of the Covid-19 pandemic was stuffed into her boot during her employment. (Crudup Deposition 78:10-79:2). It is essential to note the extreme seriousness of a used masked being in someone's belongings during the initial onset of the pandemic. While at Station 61, Ms. Crudup's helmet was tampered with during her employment. (Crudup Deposition 74:15-75:8). Understanding a firefighter's job is to understand 'Firehouse Culture.' All firehouses communicate; nothing happens in a vacuum; there are text messages and text chains that pass information among the separate firehouses. (Crudup Deposition 72:16-73:1). Ms. Crudup's investigation was common knowledge to all firehouses and the department. *Id.* Due to the harassment and discrimination, Ms. Crudup was constructively placed on unpaid medical leave since 2020, then constructively discharged. (Crudup Deposition 99:18-21; 101:10-18; Defendant's Exhibit 9). "Constructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation." *Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010) (quoting *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995).

Next, turning to the investigation of Ms. Crudup's complaints, the Fire Department has the authority to investigate and make a finding, on its own accord, under the application of its Standard

Operating Procedures and Collective Bargaining Agreement. (Olsen Deposition 35:4-9; Grauman Deposition 93:5-94:14). The Fire Department's investigator Doug Krysl who was subject to an investigation of discrimination made by a black firefighter, failed to investigate Ms. Crudup's claims to determine if there was a violation of a Collective Bargaining Agreement Violation or Standard Operating Procedures. (Olsen Deposition 35:4-14; Grauman Deposition 93:5-94:14; Plaintiff's Exhibit 13, pp. 15-16 (Answer 20)). Mr. Grauman concluded the investigation five weeks before he received Mr. Krysl's reports. Mr. Grauman has never sustained a charge of discrimination by a black firefighter. (Grauman Deposition 15:4-9). The Fire Department has six policies to abrogate harassment and discrimination, including an anti-harassment/hazing policy created by Fire Chief Olsen to address Ms. Crudup's allegations directly. (Olsen Deposition 58:5-11). However, the Fire Department did not independently investigate Ms. Crudup's complaint, notwithstanding its ability to make a determination. (Olsen Deposition 35:4-9; Grauman Deposition 93:5-94:14).

Lastly, in Defendant's brief, they stated that they were not on notice of Ms. Crudup's complaints—however, Defendant conducted a 103-day investigation while creating an anti-harassment and anti-hazing policy, in May of 2020. (Olsen Deposition 58:5-11). This allegation further questions the authenticity of Defendant's investigation and its findings. (*See Devin v. Schwan's Home Serv.*, 491 F.3d 778, 787 (8th Cir. 2007) (an employer's total failure to address discrimination complaints might constitute a retaliatory action). This discriminatory one-off alteration in the workplace rules and regulations—redefining harassment and discrimination as a "joke" or hazing, denotes a retaliatory animus toward Ms. Crudup.

Next, Ms. Crudup stated that she felt everything that occurred after she made her complaint was retaliatory. (Crudup Deposition 105:18-106:3). In October 2020, Defendant required Ms.

Crudup to submit for a Fit for Duty examination. Examiner Dr. Conner concluded that Ms. Crudup was psychologically "Unfit for Duty" as a firefighter due to the actions inflicted upon her by Defendant. (Exhibit 11, pp. 11-14). *Article 21* of the Collective Bargaining Agreement states that an employee who is a member of the Fireman's Pension System who shall sustain injuries or sickness arising out of and in the course of her employment, which are of such are character as to unfit her temporarily for active duty shall be paid her full salary for the period of such temporary disability but not to exceed (365) three hundred sixty-five calendar days. (Exhibit 11, p. 15).

Defendant was notified of Ms. Crudup's "Unfit for Duty" status. (Grauman Deposition 197:14-198:4). When describing the Injured on Duty (IOD) process, Mr. Grauman stated, "the city is very liberal how we administer IOD" and "the City usually errs on the side of the employee." (Grauman Deposition 189:2-190:1). Mr. Grauman stated that the IOD is more beneficial to an employee than the Nebraska Statutes would provide and that it's "just granted." (Grauman Deposition 202:2-203:10; 205:10-15).

Under *Article 21*, Ms. Crudup was not just granted her full salary for the period of such temporary disability, constituting an adverse retaliatory action. (*See Baker v. John Morrell & Co.,* 382 F.3d 816, 830 (8th Cir. 2004) (withholding privileges allowed other employees was considered an adverse employment action).

As it relates to procedural aspects of Title VII and NFEPA, Defendant erroneously asserts that Ms. Crudup failed to exhaust administrative remedies. It is well settled in the Eight Circuit that Ms. Crudup need not file administrative charges concerning claims that are like or reasonably related to an unlawful employment practice that she did properly exhaust. As Judge Fagg outlined in *Anderson v. Block*, 807 F.2d 145, 148 (8th Cir. 1986): [T]he judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the

[administrative] charge, including new acts occurring during the pendency of the charge." *Id*.

First, Ms. Crudup has alleged in her complaint retaliation under Section 1981. Second, the retaliation alleged by Ms. Crudup is reasonably related to:

1.   The failure to investigate her complaint,

2.   The withholding of Ms. Crudup's "Unfit for Duty' medical status, with the denial of monetary benefits based on her Injury on Duty status. (Exhibit 7 ¶ 9),

3.   Constructive discharge, which became a viable cause of action on May 30, 2022. (Defendant's Exhibit 14).

Additionally, the facts surrounding Ms. Crudup's retaliatory action based on failure to investigate "grew out of" discovery, wherein the Fire Department failed to investigate her complaint.

Lastly, since 2020, Defendant was on notice that Ms. Crudup was constructively placed on unpaid leave due to harassment and discrimination, which ripened into a constructive discharge (Exhibit 7 ¶ ¶ 9-11). "A claim is administratively exhausted if it is specifically stated in, grows out of, or is reasonably related to the substance of the allegations in the administrative charge or complaint." *Stuart v. GMC*, 217 F.3d 621, 631 (8th Cir. 2000). As such, Defendant's argument is without merit.

5.   **CONSTRUCTIVE DISCHARGE: Title VII, NFEPA, §1981**
     **Eleventh, Twelfth, and Thirteenth Cause of Action**

Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit. *Brenneman v. Famous Dave's of America, Inc.*, 507 F.3d 1139, 1144 (8th Cir. 2007). To prove constructive discharge, a plaintiff must demonstrate

that: (1) a reasonable person in her situation would find the working conditions intolerable and (2) the employer intended to force the employee to quit. *Id.* Harassment so intolerable as to cause a resignation may be effected through co-worker conduct, unofficial supervisory conduct, or official company acts. *Pennsylvania State Police v. Suders,* 542 U.S. 129, 148 (2004). If the plaintiff cannot show that the employer intended to force her to quit, she can still prevail if the employer could have reasonably foreseen that the employee would quit as a result of its actions. *Brenneman,* 507 F.3d at 1144. A reasonable employee has an obligation not to assume the worst and not to jump to conclusions too quickly. *Id.* An employee who quits without giving her employer a reasonable chance to work out a problem has not been constructively discharged. *Id.*

First, Defendant admitted that Ms. Crudup's supervisors saw or were aware of her helmet and fire coat hanging from a flagpole at the hands of a subordinate firefighter—yet took no corrective action. (Exhibit 13, pp. 12-13 (Answer 4-5)). Second, in April 2020, Ms. Crudup reported discrimination and harassment to Fire Chief Olsen and Labor Relations Director Mr. Grauman. (Crudup Deposition 70:3-12). In response to the hanging, Mayor Stothert stated, "Please investigate this. We cannot allow this to happen." (Exhibit 5, p. 4). When Mr. Grauman received Ms. Crudup's complaint, he felt it could be "a massive violation." (Grauman Deposition 154:11-15; 154:19-155:4). Mr. Grauman had a conversation with [Deb Sander], wherein he stated, "if this is what it appears to be… [I am] going to probably end up firing any individual that had anything to do with this act." (Grauman Deposition 30:25-31:10). Due to the inflicted discriminatory harm, Ms. Crudup's was forced to go on unpaid medical leave.

On July 24, 2020, Defendant's 103-day investigation determined that the harassment and discrimination inflicted upon Ms. Crudup were actually a joke and exonerated the perpetrators. At the meeting to discuss Defendant's findings with Ms. Crudup, Mr. Grauman, including various

other city officials and firefighter personnel, "laughed in the meeting and said one of the individuals [a perpetrator] was an asshole to everyone." (Crudup Deposition II 128:4-20). It is reasonably foreseeable for Ms. Crudup to resign if she reports harassment, and after a 103-day investigation, Defendant's investigator and policymakers consider it a "joke." (Exhibit 9, p. 1-2).

In Defendant's brief, they argue, Plaintiff did not give them a chance to 'work it out.' This allegation leads Plaintiff to believe the 103-day investigation conducted by a seasoned labor relations director was not Defendant's chance to 'work it out' but rather a hoax—thus retaliatory, under Title VII, NFEPA, §1981. Additionally, Defendant's brief states that they changed the policy due to the complaint. However, that's cynicism, as Defendant did not even consider the policy in their investigation, nor did they make Plaintiff aware of their newly created '*Jane Crudup Anti-Harassment Policy'* until her deposition—23 months later. (Crudup Deposition 87:6-22; Grauman Deposition 123:25-124:7).

Lastly, in Defendant's brief, they commented: '…in the end this money grab for an employee that hasn't had a full-time job in a decade; chooses to be underemployed and is looking for a windfall from the citizens of this City. She should not be rewarded for this.' Although Plaintiff recognizes that the issue of awarding monetary damages is not before the Court, Plaintiff would be remiss if she lets this dog whistle comment go unchallenged.

A discriminator's final argument before the *coup de grâce* is delivered: "You didn't belong here anyway." In actuality, Ms. Crudup did. She applied to be a firefighter on her own merit. She earned the job of a firefighter on her own merit. She became the fifth black woman firefighter in the history of the City of Omaha on her own merit. She successfully passed the rigorous standards of firefighter training and probation on her own merit. Despite enduring discrimination, harassment, ridicule, and shame, she was sworn in on April 2, 2020, as an Omaha Firefighter, on

42

her own merit. When she made a complaint detailing how she felt discriminated against and harassed, Defendant described it as a joke and laughed it off—essentially telling Ms. Crudup she would have to deal with harassment and discrimination on her own merit. (Crudup Deposition II 128:4-20). Now, on her own merit, Ms. Crudup has properly redressed this Honorable Court to help restore her dignity—that Defendant attempted to take. Title VII is the appropriate remedy to help Defendant understand discrimination and harassment are no laughing matters. Issues of material fact exist.

## CONCLUSION

For all the reasons set forth herein, Defendants' Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 must be **DENIED** in its entirety:

Dated this 29th day of November 2022

`

PLAINTIFF JANE CRUDUP

By: s/ Potso Mahlangeni-Byndon
Bar Number: 43031
Attorney for Plaintiff
2016 Fowler Avenue
Omaha, Nebraska 68110
(402) 570-1287
potso@byndonlaw.com

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d)(3), I hereby certify this brief complies with the requirements of NECivR 7.1(d)(1). Relying on the word-count function of Microsoft Office Word, this document contains 12,991 words. The word-count function was applied to all text, including the caption, headings, footnotes, and quotations.

s/ Potso Mahlangeni-Byndon
Attorney at Law

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2022, I electronically filed the foregoing **BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which sent notification to such filing to the following: Michelle Peters, 804 Omaha Douglas Civic Center, 1819 Farnam Street, Omaha, Nebraska 68183.