IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JANE CRUDUP,<br><br>  Plaintiff,<br><br>vs.<br><br>CITY OF OMAHA, a Political Subdivision,<br><br>  Defendant. | 8:21CV45<br><br>**MEMORANDUM AND ORDER** |

Plaintiff, Jane Crudup, has asserted various causes of employment discrimination while working as a firefighter for Defendant, City of Omaha. The matter comes before the Court on the City of Omaha's motion for summary judgment. Filing No. 60. For the reasons set forth herein, the Court denies the motion for summary judgment.

**I.  BACKGROUND**

Crudup is Black and was hired as a probationary firefighter with the City of Omaha in January 2019. Filing No. 56 at 1–2. After completing initial training, Crudup was assigned to Station 41 as a probationary firefighter candidate around May 2019 where Captains Scott Schendt and Todd Dippel were her supervisors. Filing No. 56 at 4. A fellow firefighter candidate, Mark Lukowski, was assigned to Station 41 at the same time. Filing No. 62-10 at 1; Filing No. 65 at 29–30. Lukowski is white. Filing No. 56 at 5.

Crudup describes several incidents in which she felt she was harassed based on her race between May 2019 and April 2020. One time, Crudup and Lukowski were tasked with breaking apart a firehose after a training exercise. Filing No. 62-10 at 1; Filing No. 65 at 42–43; Filing No. 62-3 at 6. A non-probationary firefighter, Heath Reyzlik, approached them and told them they should be using a different wrench for the task.

1

Filing No. 62-10 at 1; Filing No. 64 at 7.  Crudup disagreed with this advice and told the firefighter so.  Filing No. 65 at 42.  Schendt then came over and said that Crudup should just "shut up and listen."  Filing No. 62-3 at 8; Filing No. 65 at 43–44; Filing No. 62-10 at 2.

On another occasion, at the scene where a Black infant had died, a firefighter named Chris Vacek said, "[I]t's sad to say, but that's the best thing that could have happened to that baby."  Filing No. 65 at 32–33.  Crudup questioned how Vacek could say that about an "innocent" baby.  Filing No. 65 at 33.  He stated, "[W]ell, look at it, look at the environment that it lives in, look at its parents, it's like that's the best thing that could have happened."  Filing No. 65 at 33.  Crudup responded that "just because an individual is from a poverty-stricken area, doesn't mean, you know, that death is the best thing that could have happened."  Filing No. 65 at 33.

Another time, while watching a television show concerning politics, Schendt said that "all Democrats could just kill themselves."  Filing No. 65 at 33.  On a different occasion, Crudup and Schendt were watching a comedy program called "Tosh.0" that involved a skit with a white woman who self-identified as Black.  Filing No. 65 at 36.  Schendt stated something along the lines of, "[I]f that came to my house . . . I would shoot it."  Filing No. 65 at 36.

On or about 3, 2020, Crudup reported to Station 41 after an off-site training academy.  Filing No. 65 at 58.  She had not taken her firefighting gear, such as her helmet and coat, with her.  Filing No. 65 at 61.  Upon arriving at the station, she found her helmet and gear hanging from the flagpole in the front of the station in a manner that signified a mock lynching to her.  Filing No. 65 at 58–61; Filing No. 63 at 25.  Reyzlik was the one

who hung Crudup's gear from the flagpole. Filing No. 65-10 at 11. Schendt testified that Crudup's gear being run up the flagpole was a form of corrective action from her fellow firefighters because she was unprepared by leaving the gear behind. Filing No. 65-12 at 63, 69; Filing No. 65-11 at 95–96. White firefighters had previously had their gear run up the flagpole as well. For example, Joseph Tisthammer left his gear at Station 41 while a firefighting candidate and had it put up the flagpole in 2017. Filing No. 62-11. Matthew Salmon, also white, had his gear run up the flagpole in late 1998 or early 1999 when he was a candidate at Station 41. Filing No. 62-12 at 1. He had left his gear behind at the station when he was supposed to have it with him. Filing No. 62-12 at 1. Lastly, Eric Schack, a white firefighter, had his shirt run up the flagpole outside Station 42 when a candidate. Filing No. 62-13 at 1. It is not clear why Schack's gear was put up the flagpole as he claimed not to have left anything behind. Filing No. 62-13 at 1.

Also in mid-March 2020, Crudup went on a fuel run with Vacek and Schendt. Crudup got off the truck to pump the gas. Filing No. 65-14 at 99–100. Vacek began to drive off before Crudup was fully back on the truck. Filing No. 65-14 at 100.

In late March 2020, Village Inn donated food to Station 41. Filing No. 65 at 50. The firefighters all chose various items they wanted to take. Filing No. 65 at 50–51. When Crudup had to leave the room, other firefighters took items that Crudup had selected. Filing No. 65 at 51–52.

Crudup successfully completed her probationary status on April 2, 2020, and was subsequently transferred to Station 61. Filing No. 56 at 7. At Station 61, Crudup was subject to two incidents of harassment she argues were racially motivated: on one

3

occasion early in the COVID-19 pandemic, she found a used mask in her boot, Filing No. 65 at 78, and on another, her helmet strap was tampered with, Filing No. 65 at 74–75.

On April 12, 2020, a fellow firefighter in whom Crudup had confided sent an email to City officials in which she asserted Crudup had been discriminated against. Filing No. 65-3 at 6–7. Crudup went on unpaid medical leave starting on May 22, 2020. Filing No. 56 at 11. Crudup's psychiatrist and a psychological examiner concluded she was psychologically unfit to return to work as a firefighter and suffered from PTSD. Filing No. 65-9; Filing No. 65-14 at 191–92. Crudup filed a claim of discrimination with the Equal Employment Opportunity Commission (EEOC) and Nebraska Equal Opportunity Commission (NEOC) on November 7, 2020. Filing No. 62-8 at 3. On May 30, 2022, Crudup resigned. Filing No. 62-9.

The EEOC and NEOC issued right-to-sue letters, Filing No. 62-8 at 1, and Crudup subsequently commenced the present lawsuit. She alleges the City subjected her to racial discrimination, a hostile work environment, retaliation, and that it constructively discharged her. Filing No. 56. She also alleges an equal protection violation. *Id.* The City moves for summary judgment on all her claims.

II. ANALYSIS

A. Standard of Review

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce

admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R. Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex Corp.*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex Corp.*, 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir.

2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

### B. Race Discrimination and Constructive Discharge

The City of Omaha moves for summary judgment on Crudup's claims of federal and state race-based discrimination as set forth in her first cause of action (under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.), second cause of action (under the Nebraska Fair Employment Practice Act or "NFEPA"), and third cause of action (under 42 U.S.C. § 1981), and on Crudup's claims of constructive discharge as set forth in her eleventh (NFEPA), twelfth (Title VII), and thirteenth causes of action (§ 1981). Crudup claims the City of Omaha discriminated against her when her gear was put up the flagpole in the form of a mock lynching, eventually resulting in her having to go on unpaid leave and later quitting her job due to mental health issues. Filing No. 63 at 18–19. The City of Omaha argues that Crudup fails to show she suffered an adverse employment action or was treated differently than similarly situated non-class members. The Court finds the City of Omaha is entitled to summary judgment on Crudup's race-discrimination and constructive-discharge claims.

According to Title VII, "it is unlawful for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). Crudup must show either direct evidence of a Title VII violation or create an inference of discrimination under the burden-shifting framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). See *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878

(8th Cir. 2014). Crudup asserts no direct evidence of discrimination. See Filing No. 63 at 18–20. Therefore, Crudup must make a prima facie showing that she: (1) is a member of a protected class (here, race); (2) was meeting her employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees who were not members of her protected class. *Rebouche v. Deere & Co.*, 786 F.3d 1083, 1087 (8th Cir. 2015) (quoting *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013)). Under the *McDonnell Douglas* framework, the fourth prong can be met by showing other circumstances that give rise to an inference of discrimination*. Allen v. Interior Const. Servs., Ltd.*, 214 F.3d 978, 980 (8th Cir. 2000). The NFEPA prohibiting racial discrimination under Nebraska state law is patterned after Title VII, and courts employ the same analysis in addressing both claims. See *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005).

42 U.S.C. § 1981 provides "[a]ll persons within the jurisdiction of the United States . . . the full and equal benefit of all laws." "The elements of a Title VII disparate treatment claim and a § 1981 claim are identical" including application of the *McDonnell Douglas* burden-shifting framework. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1056 (8th Cir. 1997) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1 (1993)).

The City of Omaha does not dispute that Crudup is a member of a protected class based on being Black and that she was qualified for her job as a firefighter. It argues, however, that she did not suffer an adverse employment action and that she was not treated differently than similarly situated non-class members. As to the latter, the City of Omaha presented evidence from three other firefighters that they had had their gear put up the flagpole. For example, Tisthammer and Salmon, both white firefighter candidates,

averred they had their gear run up the flagpole for leaving it behind at the station. Filing No. 62-11; Filing No. 62-12. A third white firefighting candidate, Schack, had his shirt put up the flagpole but did not know the reason why. Filing No. 62-13. The City has not demonstrated that these white firefighters were similarly situated to Crudup such as would preclude her race discrimination claim. First, these incidents occurred years prior to the incident involving Crudup—in Salmon's case, nearly 20 years earlier. Second, as to Schack, the incident occurred at a different station (Station 42), and he testified he did not know the reason why his gear was put up the flagpole. Third, while Tisthammer and Salmon averred their gear was put up the pole as a corrective action for leaving their gear behind, Crudup testified the action was racially motivated and symbolized a mock lynching. Crudup's gear was positioned so the helmet was a few feet above the firefighting suit, making it look like a body. Filing No. 65-7 at 1. The City failed to present evidence of the manner in which the white firefighters' gear was suspended from the flagpole and whether it also resembled a hanging body. Thus, there is a dearth of evidence from which the Court can conclude Crudup was treated in the same manner and from which the Court can conclude the white firefighters were similarly situated.

The City next claims Crudup's discrimination claims fail due to the lack of an adverse employment action. Crudup alleges that her use of unpaid medical leave was an adverse employment action and her eventually quitting her job constituted a constructive discharge which serves as an adverse employment. Crudup also raises separate federal, state, and § 1981 constructive-discharge claims based upon the same facts. Filing No. 63 at 40–43.

"An adverse employment action is defined as a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013) (citing *Wilkie v. Dep't of Health & Hum. Servs.*, 638 F.3d 944, 955 (8th Cir. 2011)). "A constructive discharge occurs when an employer deliberately renders an employee's working conditions intolerable with the intent of forcing the employee to leave the employment." *Spears v. Missouri Dep't of Corr. & Hum. Res.*, 210 F.3d 850, 854 (8th Cir. 2000) (quoting *Knowles v. Citicorp Mortg., Inc.*, 142 F.3d 1082, 1086 (8th Cir. 1998)). "Whether working conditions are sufficiently objectionable to support a claim for constructive discharge is determined by an objective standard, not the employee's subjective feelings." *Id.* (citing *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1247 (8th Cir. 1998)).

Crudup being forced to go on unpaid medical leave and eventually having to quit her job can constitute an adverse employment action and can support her constructive-discharge claims. To the extent Crudup argues her use of unpaid leave was *analogous* to a constructive discharge, the Court applies the same objective standard as to whether the employer deliberately rendered the working conditions intolerable that it uses to determine whether her actually quitting was a constructive discharge. *See White v. Honeywell, Inc.*, 141 F.3d 1270, 1279 (8th Cir. 1998). Crudup presented evidence of the mock lynching as well as several other incidents that rendered her workplace intolerable, such as a coworker commented on a Black baby dying as being the best thing for it and

9

Schendt saying that he'd shoot a fictional character, a white woman who identified as Black. This is evidence by which a reasonable person could find Crudup's working conditions intolerable. Accordingly, the City of Omaha is not entitled to summary judgment in on Crudup's claims of racial discrimination or constructive discharge.

### C. Hostile Work Environment

The City of Omaha next moves for summary judgment on Crudup's claims of hostile work environment found at counts four (Title VII), five (NFEPA), and six (§ 1981). It argues there is no evidence of unwelcome harassment, no nexus to Crudup's race, no effect on a term or condition of Crudup's employment, and the City did not know about the harassment. The Court finds the City is not entitled to summary judgment on Crudup's federal and state hostile-work-environment claims.

Title VII prohibits an employer from subjecting its employees to a hostile work environment "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). To demonstrate a hostile-work-environment claim under Title VII, the plaintiff must establish that: (1) she is a member of a protected class; (2) she was exposed to unwelcome harassment; (3) the harassment was based on a protected characteristic of the plaintiff; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassing behavior, but failed to take proper action to alleviate it. *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 978 (8th Cir. 2006) (citing *Al-Zubaidy*, 406 F.3d at 1038). The same standard governs Crudup's hostile-work-environment claims under § 1981 and NFEPA. *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (§ 1981); *Al-Zubaidy*, 406 F.3d at 1039–40 (NFEPA)

"[T]he Supreme Court has 'made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment.'" *Al-Zubaidy*, 406 F.3d at 1038 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). A court looks to all the circumstances to determine whether a work environment is hostile or abusive, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

Crudup alleges she was subject to harassment based on the following incidents: her firefighter gear was run up the flagpole; she was told to shut up and listen while attempting to uncouple a firehose with Lukowski; Schendt spoke about wanting to "shoot" a white woman on a comedy program who identified as Black; Vacek said death was the best option for a Black baby who had died on a call; Vacek drove off without Crudup in the firetruck after refueling; other firefighters took items Crudup had claimed from a Village Inn food donation; Crudup found a used mask in her boot; and Crudup's helmet strap was tightened. Filing No. 63 at 26–28. The evidence these incidents occurs disputes the City's claim that Crudup was not subject to harassment at all.

Next, the City argues these incidents had no nexus to Crudup's race, but the evidence against refutes this claim. Schendt and Vacek's comments were explicitly tied to race, and there is evidence by which the fact finder could conclude the incident of Crudup's gear being hung from the flagpole was also racially motivated as a symbolic mock lynching.

11

The City also argues these incidents did not have an effect on a term or condition of Crudup's employment and that it was not aware of the harassment. Looking at the totality of the incidents, the Court concludes they are extreme enough to amount to a change in the terms and conditions of Crudup's employment. There is also evidence the city knew about these incidents; Schendt, Crudup's supervisor, was involved in several of the incidents and there was evidence the hanging of Crudup's gear was widely visible not only at the station but throughout the neighborhood. Filing No. 65-12 at 34. Thus, the City either knew or should have known about the harassment Crudup suffered by failed to take action. Accordingly, the City of Omaha's motion for summary judgment on Crudup's claims of hostile work environment are denied.

### D. Equal Protection

Next, the City of Omaha moves for summary judgment on Crudup's claim under 42 U.S.C. § 1983 that it violated the equal protection clause of the Fourteenth Amendment.

Section 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or proper proceeding for redress.

42 U.S.C. § 1983. A municipal entity can only be liability for a § 1983 constitutional violation in certain circumstances, however:

> Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an "official municipal policy," *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), (2) an unofficial "custom," *id.*; or (3) a deliberately indifferent failure to train or supervise, *see City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

*Corwin v. City of Indep., MO.*, 829 F.3d 695, 699 (8th Cir. 2016).

Crudup generally argues that the City permitted her to be subjected to race-based harassment. *See* Filing No. 63 at 34–36. While Crudup points to various internal policies and city code provisions relating to general harassment or hazing, none of them permit racial discrimination in any form and most do not even mention or relate to race. In fact, the evidence shows the City of Omaha had official policies prohibiting race discrimination in the form of an executive order and a city ordinance. Filing No. 62-1 at 15; Filing No. 62-6. There is therefore no evidence of an official municipal policy that would subject the City of Omaha to municipal liability.

However, Crudup has presented evidence of either an unofficial custom or failure to train that resulted in the violation of equal protection.

> [A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation."

*Corwin*, 829 F.3d at 700 (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014). A failure-to-train claim under § 1983 requires that the "municipality '[r]eceived notice of a pattern of unconstitutional acts committed by [its employees]'" and failed to train them thereafter. *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1217 (8th Cir. 2013) (alterations in original) (quoting *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010). As set forth in greater detail above, there is evidence of on-going race-

based discrimination which the City failed to remedy. Therefore, the City of Omaha is not entitled to summary judgment on Crudup's § 1983 equal protection claim.

### E. Retaliation

Lastly, the City of Omaha moves for summary judgment on Crudup's claims of retaliation, counts eight (Title VII), nine (NFEPA), and ten (§ 1981). The City argues Crudup failed to exhaust her administrative remedies as to her claims of retaliation or, alternatively, that she has failed to establish a prima facie case of retaliation. The Court finds the City is entitled to summary judgment because there is no evidence of an adverse employment action.

A plaintiff establishes a prima facie claim of retaliation "by providing evidence from which a jury could conclude that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) a causal connection exists between her protected activity and the adverse employment action." *Fezard v. United Cerebral Palsy of Cent. Arkansas*, 809 F.3d 1006, 1011 (8th Cir. 2016) (citing *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002). However, to exhaust her remedies, a Title VII plaintiff must first timely file her charges with the EEOC and receive, from the EEOC, a "right to sue" letter. 42 U.S.C. § 2000e-5(b), (c), (e). The proper exhaustion of administrative remedies gives the plaintiff a green light to bring her employment-discrimination claim, along with allegations that are "like or reasonably related" to that claim, in federal court. *Shannon v. Ford Motor Co.*, 72 F.3d 678, 684 (8th Cir. 1996). A plaintiff must likewise exhaust her administrative remedies with the NEOC prior to bringing suit. See *Reyes v. Pharma Chemie, Inc.*, 890 F. Supp. 2d 1147, 1167 (D. Neb. 2012). In contrast, a retaliation suit brought under § 1981 has no exhaustion requirement. See, e.g., *Winbush*

14

*v. Iowa By Glenwood State Hosp.*, 66 F.3d 1471, 1486 (8th Cir. 1995) ("Suits under § 1981 do not require the administrative exhaustion procedures found under Title VII.").

The City argues Crudup did not exhaust her administrative remedies as to her retaliation claim because she did not check the "retaliation" box on her NEOC/EEOC form, and the claim is not like or reasonably related to her discrimination claims. As to the latter argument, the City notes that Crudup did not report the alleged discrimination to it until April 12, 2020, and the only acts of supposed harassment that occurred after that date (finding a used mask in her boot and having her helmet tampered with) were not included in the factual basis of her NEOC and EEOC form. However, while Crudup does reference the mask and helmet incidents in support of her retaliation claim, she primarily argues the City retaliated against her by forcing her to go on unpaid medical leave, eventually culminating in her constructive discharge. Her unpaid medical leave featured heavily in her NEOC and EEOC claims, and her related decision to quit her job did not occur until after filing the notice. Therefore, the discrimination claims she administratively exhausted are like or reasonably related to her retaliation claim for exhaustion purposes in that they both focus on her being forced to stop working due to alleged discrimination.

The City next argues that, even if Crudup can raise her retaliation claims in this lawsuit, they must fail because there is no evidence of an adverse employment action. As explained in detail above, Crudup being forced to go on unpaid medical leave her alleged constructive discharge can constitute an adverse employment action. Accordingly, the City of Omaha's motion for summary judgment on Crudup's retaliation claims is denied.

15

### III. CONCLUSION

For the reasons set forth herein, the City of Omaha's motion for summary judgment is denied as to all of Crudup's causes of action.

IT IS ORDERED:

1. Defendant's, City of Omaha's, Motion for Summary Judgment, Filing No. 60, is denied.

Dated this 31st day of March 2023.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge
